PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 8/14/96**

TENTH CIRCUIT

_____

|  |  |  |
|---|---|---|
| TEAMSTERS LOCAL UNION NO. 435, AFFILIATED WITH THE INTER- NATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 95-9528 |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Respondent. | ) | |

_____

Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

_____

David R. Eason (Martin D. Buckley with him on the brief), of Berenbaum, Weinshienk & Eason, P.C., Denver, Colorado, for the Petitioner.

William M. Bernstein, Attorney, (Frederick L. Feinstein, General Counsel; Linda Sher, Associate General Counsel and Aileen A. Armstrong, Deputy Associate General Counsel, with him on the brief), National Labor Relations Board, Washington, D.C., for the Respondent.

_____

Before HENRY, LIVELY* and MURPHY, Circuit Judges.

_____

---

* The Honorable Pierce Lively, United States Circuit Judge for the Sixth Circuit, sitting by designation.

LIVELY, Circuit Judge.

_____

A union petitions for review of a decision of the National Labor Relations Board (the Board) finding that the union violated the duty of fair representation in "negotiating, performing and giving effect to" a collective bargaining agreement. The Board has filed a cross-application for enforcement.

After a union member filed a complaint, an administrative law judge (ALJ) held a hearing and subsequently filed her decision. Upon considering the union's exceptions and the General Counsel's response, the Board entered a decision and order affirming the ALJ's rulings, findings, and conclusions and adopting her recommended order, including remedial provisions. *Teamsters Local Union No. 435 (Super Valu, Inc.)*, 317 N.L.R.B. 617 (1995). This court has jurisdiction under section 10(f) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(f) (1988).

## I.

The ALJ's decision, which is appended to the Board's decision and order, contains detailed findings. A summary of those findings follows. The facts were largely undisputed, but where there was conflicting testimony, the ALJ credited the employees' testimony over the testimony of witnesses who represented the employer or the union.

## A.

Super Valu, Inc. is a wholesaler of grocery items and "general merchandise" items, such as over-the-counter drugs, housewares and health and beauty aids, to independent retailers. In 1982, it purchased a warehouse located in Aurora, Colorado that had been owned by Western Grocers, Inc. This warehouse principally stocked grocery items. The employees of the Western Grocers warehouse had been represented by Teamsters Local Union No. 435 (the union) since 1940, and following the acquisition, Super Valu recognized the union as the collective bargaining representative for those employees. In 1987, Super Valu relocated this grocery operation to a new location on Tower Road in Aurora.

Meanwhile, Super Valu's general merchandise business increased substantially, causing it to create an entity called Preferred Merchandisers (Preferred) and to lease another warehouse in Aurora. Preferred conducted a general merchandise operation in the new warehouse and staffed it with non-union employees.

A dispute arose between the union and the company over whether Preferred employees were covered by the grocery operation's collective bargaining agreement, and Super Valu filed a unit clarification petition with the Board pursuant to section 9(c) of the NLRA, 29 U.S.C. § 159(c). The Board held that the Preferred employees did not form an accretion to the grocery bargaining unit, but rather, constituted a separate unit. *Super Valu Stores, Inc.*, 283 N.L.R.B. 134 (1987). After one unsuccessful effort, the union won

a representative election in 1990, resulting in certification of the union as the bargaining

representative of the employees at Preferred.

**B.**

In its 1992 negotiations with the union concerning the renewal of the collective

bargaining agreement covering the 200 or so Tower Road employees (the Tower Road

Agreement), Super Valu raised the possibility of consolidating the Preferred and Tower

Road operations. The much smaller group of about 30 Preferred employees expressed

concern over how such a move would affect their contractual rights, but the union

allowed only Super Valu representatives and members of the Tower Road bargaining unit

(the Tower Road unit) to attend the Tower Road negotiations.

During the Tower Road negotiations, Super Valu proposed that a new general

merchandise department be established at the Tower Road location; that the Preferred

employees' company seniority would be dovetailed with the Tower Road employees'

company seniority; and that all employees would be covered by the Tower Road

Agreement. Super Valu also proposed that the Preferred employees would retain their

rate of pay at 70 percent of the Tower Road warehouse rate, which reflected in part the

fact that general merchandise work was less rigorous than grocery work. In its

counterproposal, the union specifically suggested that the new general merchandise

4

department should have only two job classifications, order selector and stocker[1]; that

former Preferred employees after the move should retain only "union seniority," or

seniority measured as of the effective date of the collective bargaining agreement

covering the Preferred employees (the Preferred Agreement) in June 1991; that both

Tower Road and Preferred employees should be allowed to bid on the new general

merchandise positions (open bidding); and that the employees in the new general

merchandise department should be paid 85 percent of the warehouse rate.

The company rejected the union's proposal for open bidding because it would

eliminate existing departmental preferences in bidding and thus thwart its desire to keep

those employees most familiar with general merchandise work in the general merchandise

department after the move. The company agreed, on the other hand, to the union's

proposal for limiting the number of general merchandise job classifications, since the

proposal would help eliminate any duplication of functions when the two warehouses

were consolidated. The company also accepted dovetailing based on *union* seniority, and

compromised on a wage rate for general merchandise employees at 75 percent of the

existing Tower Road warehouse rate. The company would not agree to pay general

---

[1]Super Valu's director of labor relations described these positions at the hearing: "The order selector would be the one taking [] stickers, going around, and picking the customer's order and getting it ready to be staged for shipment. A stocking person would be a person that is taking merchandise or product out of reserve and putting it into the picking slots." Tr., Record Vol. I at 31.

merchandise employees 85 percent of the warehouse rate because of competitive considerations.

Having reached an agreement, the company and the union drafted a letter of understanding, referred to as Addendum F, which would incorporate the agreed-upon proposals into the Tower Road Agreement. Addendum F also specifically provided that in the event of a move, Preferred employees would be placed in the order of their seniority into any job openings in the new general merchandise department, and that job openings created after the move would be filled by ordinary bidding procedures.

Addendum F's limitation on job classifications in the new general merchandise department, which was proposed by the union, would effectively eliminate what had been the more desirable jobs at Preferred, since the remaining selector and stocker positions were considered the most physically strenuous and therefore the least desirable jobs in the warehouse. The more desirable positions held by Preferred employees--such as the receiver, forklift, salvage, inventory control and sanitation jobs--were to be assigned to Tower Road employees in existing departments. Furthermore, only four Tower Road employees had been hired after June 11, 1991, the date from which the Preferred employees' union seniority would accrue. Thus, as a result of the proposed dovetailing based on union seniority, the 25 Preferred employees who had been hired before June 11, 1991, would become junior to all but those four Tower Road employees, regardless of

6

their actual accumulated company time.

The union did not change its bargaining position in the negotiations over the Tower Road Agreement after it learned of the Preferred employees' dissatisfaction with the union's seniority proposals. In an affidavit, Steve Vairma, the union's vice-president and chief spokesman during negotiations, acknowledged that the Tower Road bargaining committee "felt [the Preferred employees] should carry only their union seniority, since they had been in the union for a short period of time." Tr., Record Vol. I at 143. And at the hearing, Vairma testified that he did not attempt to override the bargaining committee's position on the seniority issue because "[t]he [Tower Road] membership would not have accepted it" and "[t]hey would have voted against the contract." *Id.* at 284.

## C.

On September 23, 1992, Tower Road employees overwhelmingly ratified Addendum F. Five months later, a Preferred employee filed a charge with the Board alleging that the union failed to represent fairly the interests of Preferred employees in the Tower Road negotiations.

In the spring of 1993, Super Valu notified the union by letter that it was going to close, rather than move, the "legal entity `Preferred Merchandisers'" and that the work performed there would be moved to the Tower Road facility in June or July.

Upon receiving news of the closure, union representatives held a meeting, attended by almost all of the Preferred employees, to decide between two alternatives for the Preferred employees. The union representatives told them that they could either: (1) keep the protections under Article 1.02 of the Preferred Agreement, which only guaranteed that the Preferred employees would "be offered opportunities for employment prior to any new hires at the new location"; or (2) accept instead Addendum F of the Tower Road Agreement. The ramifications of each option were fully discussed at the meeting. Preferred employee Allen Arnold suggested that a third alternative of receiving company seniority was more preferable than either of the options given to them, but, according to Arnold: "Steve Vairma, [and the other union representative], they wouldn't discuss it. They said we were here for one reason, one reason only, to vote." Ultimately, all but one of the Preferred employees in attendance voted in favor of accepting Addendum F.

## II.

The ALJ determined that the union deferred entirely to the interests of the Tower Road employees in negotiating Addendum F, "admittedly because they had far greater numbers and were members of the Union for a longer period of time," and that such

conduct was discriminatory and arbitrary in violation of section 8(b)(1)(A) of the NLRA,

29 U.S.C. § 158(b)(1)(A).  The ALJ explained:

> [The union] had an obligation to represent both units fairly and at the least,
> advance the interests of the Preferred Merchandisers unit while negotiating
> the effects of the proposed consolidation in the Tower Road collective-
> bargaining agreement.  [The union] admittedly failed to meet this
> obligation, and instead capitulated entirely to the will of the Tower Road
> unit deeming the interests of the Preferred Merchandisers employees
> uninvolved and superfluous.

The ALJ recommended that the union be ordered to cease and desist from its failure to

represent former Preferred employees fairly and from restraining or coercing employees

in the exercise of their rights guaranteed by the NLRA, and to take certain "affirmative

action necessary to effectuate the policies of the [NLRA]."

The affirmative requirements involved notifying Super Valu and all former

Preferred employees that the union had "no objection" to the restoration of the Preferred

employees to  positions on the seniority list that reflected their length of service with

Preferred and "no objection" to negotiating with Super Valu on the issue of restoring the

positions removed from those employees.  In the alternative, the order provided that the

union could agree to negotiate procedures for job bidding that would give Preferred

employees a reasonable opportunity to maintain their Preferred positions.  In addition, the

order required the union to stop giving effect to the provisions of Addendum F of the

Tower Road collective bargaining agreement containing the unlawful seniority and

bidding procedures. Finally, the order contained a "make whole" provision and required the union to post a notice.

### III.

### A.

We consider first the union's jurisdictional and procedural arguments.

The union contends that the Board lacked jurisdiction to determine whether there was a violation of the duty of fair representation in negotiating the collective bargaining agreements with Super Valu. The union makes two distinct arguments, neither of which requires extended discussion.

First, in its brief and at oral argument, the union stated that the duty of fair representation doesn't even apply or arise during contract negotiations. It argues the duty arises only after a collective bargaining agreement is in existence and the union has been elected and certified. This position is completely untenable in light of the Supreme Court's holding in *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991), that the duty of fair representation "applies to all union activity, including contract negotiation." See also *Le'Mon v. N.L.R.B.*, 952 F.2d 1203, 1205 (10th Cir. 1991), *cert. denied*, 506 U.S. 830 (1992).

Second, the union asserts that since section 8(b) of the NLRA does not include the duty of fair representation among unfair labor practices, the Board has no jurisdiction

10

over claims that a union violated its duty of fair representation. Since the duty of fair

representation had its genesis in court decisions, the union argues, only a court may

consider a claim that a union has violated this duty. We find no support for this

argument, and align this court with our sister courts that have rejected it. See *Plumbers &*

*Pipe Fitters Local Union No. 32 v. N.L.R.B.*, 50 F.3d 29, 31-32 (D.C. Cir.), *cert. denied*,

116 S. Ct. 474 (1995) ("a breach of the duty of fair representation can constitute an unfair

labor practice within the jurisdiction of the Board"); *N.L.R.B. v. General Truckdrivers,*

*Warehousemen and Helpers*, 778 F.2d 207, 213 (5th Cir. 1985) ("[a]lthough there is no

explicit statutory requirement of `fair representation,' the Board and the courts have

declared a violation of the duty [of fair representation] to be a violation of section

8(b)(1)(A) [of the NLRA]"); *N.L.R.B. v. Local 282 Int'l Brotherhood of Teamsters,*

*Chauffeurs, Warehousemen and Helpers of America*, 740 F.2d 141, 144-46 (2d Cir. 1984)

("a union may be

found to have engaged in an unfair labor practice by breaching its statutory duty of fair

representation within the requirements of section 8(b)(1)(A) of the NLRA").


The union also argues that the Board improperly shifted the burden of proof from

the General Counsel to the union. The union takes particular exception to the language in

the ALJ's decision where she states: "[The union] failed in this case to establish it met the

11

standard of fair representation described in *Ford Motor Co. v. Huffman*, [345 U.S. 330,

337 (1953)], by demonstrating it was responsible to and met is [sic] obligation of loyalty

to the members of the Preferred Merchandisers unit."  The union cites *Air Line Pilots*

*Ass'n*, 499 U.S. at 67, for the proposition that the General Counsel bears the burden of

establishing a breach of the duty of fair representation.  However, the union fails to

consider the statements in the preceding paragraph, where the ALJ stated:

> The General Counsel bases its case on the claim [the union] failed to meet its duty of fair representation to all the employee [sic] in the new Tower Road unit.  I find this argument is persuasive based on the facts of this case. . . . [The union] negotiated addendum F to favor the Tower Road unit members in the anticipated event the Preferred Merchandisers unit members became a part of the Tower Road unit.  It based this favoritism in addendum F on the length of the Preferred Merchandisers employees' length of union representation at Preferred Merchandisers.

The ALJ and the Board simply determined that the General Counsel carried its

burden of proof in establishing that the union breached its duty and that the union simply

failed to produce sufficient evidence to challenge the General Counsel's proof.  The

Board's opinion does not shift the burden of proof to the union.

**B.**

In the alternative, assuming the Board had jurisdiction over the complaint and the

Board did not improperly shift the burden of proof, the union asserts that the Board's

decision is not supported by substantial evidence and takes exception to the Board's

determination that it arbitrarily favored the Tower Road unit during the negotiations leading up to the relocation of the Preferred unit. The union insists that it negotiated a rational solution for the relocation of the Preferred employees. The union claims Addendum F provides several benefits for the Preferred employees: it permits the Preferred employees to staff the new general merchandise department at the Tower Road facility; ensures the Preferred employees would have bidding preference for any future new jobs in the general merchandise department; and awards the Preferred employees a pay increase. The union claims these benefits compensated the Preferred employees for accepting the aspects of Addendum F that were detrimental to their position--accepting union rather than company seniority and eliminating jobs from the general merchandise department rather than the grocery department. The union insists that its actions during the course of the negotiations were undertaken with a goal of fairly representing the interests of both the Tower Road and Preferred units.

The Board responds by asserting that there is substantial evidence in the record to support its findings, relying heavily on statements made by the union and its representatives which demonstrate that the union did not promote the Preferred unit during the negotiations with Super Valu.

This issue requires further discussion.

13

**IV.**

**A.**

In *Vaca v. Sipes*, 386 U.S. 171, 177 (1967), the Supreme Court described the three

elements of the judicially-developed duty of fair representation:

> Under this doctrine, the exclusive agent's statutory authority to represent all
> members of a designated unit includes a statutory obligation to serve the
> interests of all members without hostility or discrimination toward any, to
> exercise its discretion with complete good faith and honesty, and to avoid
> arbitrary conduct.

Courts must accord due deference to a union's decisions in balancing conflicting

claims of its members.  Thus, as the Supreme Court stated in *Ford Motor Co. v. Huffman*,

345 U.S. at 338:

> The complete satisfaction of all who are represented is hardly to be
> expected.  A wide range of reasonableness must be allowed a statutory
> bargaining representative in serving the unit it represents, subject always to
> complete good faith and honesty of purpose in the exercise of its discretion.

Recognizing both *Vaca*'s tripartite definition of the duty of fair representation and

the deference due a union's attempt to reconcile competing claims, this court stated in

*Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463 (10th Cir.

1993), *cert. denied*, 114 S. Ct. 880 (1994):

> A union breaches its duty of fair representation if its conduct toward a
> member is "arbitrary, discriminatory, or in bad faith."  A union's actions are

14

> arbitrary only if, "in light of the factual and legal landscape at the time of
> the union's actions, the union's behavior is so far outside a `wide range of
> reasonableness' as to be irrational." A union's discriminatory conduct
> violates its duty of fair representation if it is "invidious." Bad faith requires
> a showing of fraud, or deceitful or dishonest action. . . . [I]f the evidence
> supports a finding that the Union acted in any one of these three ways, the
> [Board's decision] must be upheld.

*Id.* at 1470 (citations omitted).

The fact that a union discriminates between groups of employees solely on the basis of length of union membership is evidence of arbitrary conduct. In a case similar to the present one, a union gave seniority to those employees who had been union members prior to negotiation of a new collective bargaining agreement over those who had not been union members. The court held such discrimination was "arbitrary and invidious and violate[d] the union's duty to represent fairly all members of the bargaining unit." *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 797 (2d Cir. 1974).

Another court reached the same conclusion in a case where a union refused to consider dovetailing the seniority of employees who transferred from two plants that the employer had closed to a plant at a third location. The union had "endtailed" all the employees of the new plant who had worked at a closed plant that was non-union, resulting in a preferred status for the transferees from the unionized plant. Longer union

15

membership was the only reason given for preferring one group of employees over the other. This union action was a violation of the duty of fair representation. *Teamsters Local Union No. 42 v. N.L.R.B.*, 825 F.2d 608, 612-13 (1st Cir. 1987).

The facts of this case are even more compelling because the union refused to permit Preferred employees even to attend, much less participate, in bargaining sessions that involved their employment rights.

## B.

Our standard of review is clear. We must uphold the Board's decision if its findings are "supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951); *Monfort, Inc. v. N.L.R.B.*, 965 F.2d 1538, 1540 (10th Cir. 1992).

## 1.

It is undisputed, and the record clearly shows, that Super Valu proposed consolidating the two units by creating a new general merchandise department at the Tower Road location, dovetailing the Preferred employees' company seniority with the Tower Road employees' company seniority, and providing the Preferred employees with the same pay scale they received at the Preferred location. It was the union that proposed

transferring all but the two most physically demanding jobs from the general merchandise department to the grocery department and basing the Preferred employees' seniority on their union tenure.

Regarding the transfer of general merchandise jobs to the grocery department, the ALJ noted "no reason, other than deference to the larger Tower Road unit, was advanced [by the union] as the basis for [its] failure to represent in any manner the interests of the Preferred Merchandisers employees." The ALJ specifically concluded that by proposing the limitation of job classifications in the general merchandise department "the [u]nion again acquiesced to the desires of the then Tower Road unit to gain as much as possible from the situation during these negotiations, without regard to any of the interests of the Preferred Merchandisers employees." These statements are supported by the record and evidence the union's arbitrary treatment of the Preferred unit.

Regarding the decision to suggest union seniority for the Preferred employees, Steve Vairma, the union vice-president, admitted in his affidavit:

> [The Tower Road bargaining committee] didn't want to grant [the Preferred unit] almost the super seniority status; they had only been members [of the union] since that contract was ratified, and that prior to 1991, they had no [union] seniority. . . . Instead of giving Preferred people extra seniority, the Super Valu committee felt they should carry their union seniority, since they had only been in the union for a short period of time.

Tr., Record Vol. I at 141-43.

The only benefit for the Preferred unit contained in the union's counterproposal was a pay increase; however, this benefit was somewhat illusory because, when coupled with the union's proposed open bidding procedure, the benefit would not have been limited to the members of the Preferred unit.[2] Further, the only Preferred employees eligible to receive the benefit were those fortunate enough not to be in the thirty to fifty percent of the unit who were to lose their jobs after the relocation.

**2.**

The record also clearly shows the union refused to permit the Preferred employees to participate in the negotiating process leading up to the formulation of Addendum F. A Preferred unit employee asked Vairma if members of the Preferred unit could attend the 1992 Super Valu-Tower Road negotiations. Vairma refused to allow Preferred employees to attend, however, because "it didn't concern [them]" and because the Preferred employees were not yet members of the Tower Road unit. Tr., Record Vol. I at 212. These statements were made by Vairma despite the fact that the negotiations were

---

[2]In fact, the union's open bidding proposal, when examined in conjunction with its union seniority proposal, would have allowed all but four of the 200 plus members of the Tower Road unit to outbid the members of the Preferred unit for any of the jobs in the new general merchandise department. These proposals would have ensured the Tower Road unit the best jobs and limited the Preferred unit to the least desirable positions.

designed to govern any future consolidation of the two units and that the union had permitted a member of the Tower Road unit to attend some of the bargaining sessions that led to the 1991 Preferred Agreement.

The particular facts of this case, including without limitation, the ban on Preferred employees to even attend the bargaining session, render the union's favoring of one group over another solely on the basis of union longevity a violation of the union's duty of fair representation.

**3.**

It may well be that if the union had undertaken any effort to promote the interests of the Preferred unit, such as by suggesting to dovetail the two units based on company seniority, the majority of the union membership would have voted against such a proposal, leaving the Preferred unit in a position similar to the one prescribed in Addendum F. By failing to make any effort to advance the Preferred unit's concerns, however, the union breached its duty of fair representation. The union is not authorized to assume what terms would be acceptable to the majority of its membership; rather, such determinations are "matter[s] for the bargaining table." *Teamsters Local Union No. 42*, 825 F.2d at 613.

The union acted arbitrarily by taking upon itself the task of determining what the majority would accept, rather than promoting the interests of the various units and letting

the democratic process resolve the issues. Through its actions, the union, rather than its

membership, determined that the consolidation should favor the Tower Road unit.

## V.

The union next argues that even if the Board's finding of a violation is supported

by substantial evidence, the Board exceeded its remedial powers in fashioning some of

the affirmative requirements of its order. The union maintains that the affirmative

requirement that it notify Super Valu and the former Preferred employees that it has "no

objection" to restoring company seniority and to negotiating concerning certain other

issues is tantamount to requiring the union to agree to substantive contractual terms. As

the union states, the Board cannot direct the parties to agree to particular substantive

provisions of a collective bargaining agreement, but can only direct them to follow the

law in reaching an agreement. In response, the General Counsel contends that the union

did not raise this issue before the Board, and, therefore, review of objections to the

remedial order is foreclosed. 29 U.S.C. § 160(e).

## A.

Section 10(e) of the NLRA provides: "No objection that has not been urged before

the Board, its member, agent, or agency, shall be considered by the [reviewing] court,

unless the failure or neglect to urge such objection shall be excused because of

extraordinary circumstances." 29 U.S.C. § 160(e); see also 29 C.F.R. § 102.46(b)(2)

(1995) ("Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be waived.") and 29 C.F.R. § 102.46(g) (1995) ("No matter not included in exceptions or cross-exceptions may thereafter be urged before the Board, or in any further proceeding."). Section 10(e) serves "the salutary policy . . . of affording the Board opportunity to consider on the merits questions to be urged upon review of its order." *Marshall Field & Co. v. N.L.R.B.*, 318 U.S. 253, 256 (1943). Thus, the subsection requires "notice of objection," *Local 900, Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. N.L.R.B.*, 727 F.2d 1184, 1192 (D.C. Cir. 1984), and before we consider the merits of the union's argument, we must determine whether the union's exceptions to the ALJ's findings were "sufficiently specific to apprise the Board that [the] issue might be pursued on appeal." *Consolidated Freightways v. N.L.R.B.*, 669 F.2d 790, 793 (D.C. Cir. 1981).

We believe the union's exceptions were sufficiently specific to satisfy section 10(e). The union's objections contained the statement, "The ALJ in ruling in favor of the General Counsel and against Local 435 did not allow Local 435 to act within a wide range of reasonableness, rather *she gave Local 435 only one choice and that was to dovetail seniority*." Exceptions, Record Vol. III, Item No. 2 at 8-9 (emphasis added). Although the exceptions were addressed to the ALJ's findings in general rather than to the remedy specifically, we conclude that this language gave notice to the Board that the

21

union objected to the fact that, according to the union's interpretation, the order required it to agree to a substantive contractual provision.

**B.**

The Board has "wide discretion" under 29 U.S.C. § 160(c) in fashioning a remedy, which may contain provisions requiring affirmative action. *Virginia Elec. & Power Co. v. N.L.R.B.*, 319 U.S. 533, 539 (1943). Nevertheless, the Board's remedial powers are "limited to carrying out the policies of the [National Labor Relations] Act . . . ," and "[o]ne of these fundamental policies is freedom of contract." *H.K. Porter Co., Inc. v. N.L.R.B.*, 397 U.S. 99, 108 (1970). Thus, the Board cannot dictate the terms of a labor contract, which should be decided upon by the give and take of collective bargaining. *Id.* at 103-04, 108. Given these limitations, however, it remains a firm principle of labor law that "the relation of remedy to policy is peculiarly a matter for administrative competence." *Detroit Edison Co. v. N.L.R.B.*, 440 U.S. 301, 316 (1979) (quoting *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 194 (1941)).

The affirmative provisions of the order must be examined in light of the union's earlier position, which consistently favored union seniority for the Preferred employees. The elimination of the Preferred employees' company seniority did not result from the union acceding to an employer position in order to gain some other benefit for its members. Rather, the employer proposed company seniority, and the union rejected it in

22

order to give an advantage to the larger group of its members who had belonged to the union longer than the smaller group. This was the essence of the union's unfair representation, and the order simply requires the union to negotiate in a manner designed to remedy this unlawful conduct. We believe this order was well within the Board's authority in fashioning a remedy.

Our understanding of the "no objection" language in the order is that it directs the union to signal its willingness to negotiate on the issues of seniority and job positions for the former Preferred employees in a manner that fairly represents the concerns of Preferred employees, and that it does not specify the particulars of what the union might propose on those topics or what the final agreement between the parties need be. The remaining affirmative provisions of the order are unexceptional, merely requiring the union to no longer rely on Addendum F, which contains procedures found to be unlawful, and to make injured employees whole.

## C.

The union also challenges the affirmative elements of the order on the ground that it was an abuse of the Board's discretion to impose such requirements without a specific finding of fraud or bad faith on the part of the union. The union essentially claims that in

order for the Board to justify its affirmative order, the evidence in the record must cast

doubt on the union's willingness to fulfill its lawful responsibilities as they have been

determined by the Board and to abide by a simple cease and desist order in its subsequent

dealings with Super Valu.

We have found no authority, and the union has cited to none, which specifically

supports this proposition. In fact, with respect to the Board's broad discretionary power to

order affirmative action, the Supreme Court has observed:

> [I]n devising a remedy the Board is not confined to the record of a
> particular proceeding. "Cumulative experience" begets understanding and
> insight by which judgments not objectively demonstrable are validated or
> qualified or invalidated. The constant process of trial and error, on a wider
> and fuller scale than a single adversary litigation permits, differentiates
> perhaps more than anything else the administrative from the judicial
> process. . . . [Administrative] competence could not be exercised if in
> fashioning remedies the administrative agency were restricted to
> considering only what was before it in a single proceeding.

*N.L.R.B. v. Seven-Up Bottling Co.*, 344 U.S. 344, 349 (1953). Thus, we must defer to the

Board's expertise in its choice of an affirmative remedy unless "the order is a patent

attempt to achieve ends other than those which can fairly be said to effectuate the policies

of the [NLRA]." *Virginia Elec. & Power*, 319 U.S. at 540. In this case, the record clearly

established a violation of the duty of fair representation, and we believe that the Board in

its administrative expertise crafted an order which placed the parties where they would

have been absent the violation, consistent with the policies of the NLRA. See *id.* at 544.

24

Finally, the union argues that the provision requiring the union to negotiate on the subject of company seniority for the former Preferred employees is unjustified because no employee in either the Tower Road unit or the Preferred unit was ever entitled to seniority calculated from his or her date of hire by the company. We find no merit in this argument, since the ALJ specifically found that the Preferred Agreement afforded Preferred employees "seniority for the period of their employment with Preferred Merchandisers," and there is evidence in the record to support this conclusion.

The petition for review is **DENIED**, and the cross-application for enforcement is **GRANTED**.