FILED
United States Court of Appeals
Tenth Circuit

February 2, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

LABORERS' INTERNATIONAL
UNION OF NORTH AMERICA,
LOCAL 578,

      Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent/Cross-Petitioner.

Nos. 08-9564, 08-9569

PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(NLRB-1:27-CB-4935)

Terrence A. Johnson, Colorado Springs, Colorado, for Petitioner/Cross-Respondent.

Milakshmi V. Rajapakse (Meredith L. Jason, Supervisory Attorney, Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate General Counsel, with her on the brief), National Labor Relations Board, Washington, D.C., for Respondent/Cross-Petitioner.

Before **GORSUCH, McKAY**, and **HOLMES**, Circuit Judges.

**GORSUCH**, Circuit Judge.

In this case, the National Labor Relations Board (NLRB or Board) held that the Laborers' International Union of North America, Local 578, engaged in unfair labor practices when it persuaded Shaw Stone & Webster Construction, Inc. to fire Sebedeo Lopez for failing to pay his union dues. In support of its holding, the NLRB found that the union failed to provide Mr. Lopez with legally sufficient notice about his delinquent dues or a reasonable opportunity to cure the delinquency before it threatened, and then successfully sought, his dismissal.

Before us, the union challenges the factual findings on which the NLRB pinned its decision, arguing that a better reading of the record suggests it behaved appropriately toward Mr. Lopez. The problem is that we must affirm the NLRB's decision so long as "substantial evidence" exists in the record to support its findings. Our job isn't to make the call ourselves, but only to ask whether a reasonable mind could have made the call the NLRB made. And our review of the record of this case reveals ample, if not incontestable, evidence to support the NLRB's factual findings. So it is that we are obliged to deny the union's petition for review and grant the NLRB's cross-petition seeking enforcement of its order.

I

A

The Laborers' International Union and Shaw Stone & Webster are parties to a collective bargaining agreement. Under the agreement, the union serves as the exclusive collective bargaining agent for all laborers, journeymen laborers, and

apprentice-laborers at the company's Pueblo, Colorado work site. Like many collective bargaining agreements, this one contains a "union-security" provision requiring all employees represented by the union to join the union. If an employee fails to join the union, or fails to keep current on his union dues, the union-security provision permits the union to seek and obtain the employee's dismissal from the company.

Mr. Lopez started work at Shaw Stone & Webster on July 17, 2006. No one disputes that he was and is represented by the union in collective bargaining and so bound to join the union. In early October 2006, however, the union noticed that Mr. Lopez had not paid his initiation fee or certain dues. As a result, the union prepared a letter on October 12, 2006 addressed to Shaw Stone & Webster that "request[ed] the dismissal of" Mr. Lopez. The letter represented that Mr. Lopez owed the union $120 in late dues and $25 for reinstatement, but it did not explain how these amounts were calculated or provide Mr. Lopez any grace period in which to make payments. Instead, the letter purported to demand Mr. Lopez's immediate dismissal.

Still, not everything was quite as it appeared. Though the letter was addressed to the company, and though it spoke of Mr. Lopez in the third person, the union never sent the letter to Shaw Stone & Webster and the union did not actually seek Mr. Lopez's dismissal at that time. Instead, the union mailed the letter only to Mr. Lopez in an effort to coax him into paying up quickly.

But even still, not everything was as it appeared. Mr. Lopez insists he never received the letter or otherwise heard from the union about his overdue account. For its part, the union says that Mr. Lopez must have received the letter because it sent the correspondence to the right address, with sufficient postage, and the letter was never returned. The union also insists that it instructed Mr. Lopez's shop steward, Dave Lucero, to discuss the overdue dues problem with Mr. Lopez in person. In any event, the parties agree Mr. Lopez didn't respond with any immediate payment.

When nothing happened, the union prepared another letter, this one dated November 1, 2006. Like the first letter, this one was addressed to Shaw Stone & Webster and sought "the dismissal of" Mr. Lopez. This letter represented that Mr. Lopez's unpaid dues now totaled $415. But again like its predecessor, this letter provided no explanation about how the overdue amount was calculated, let alone why the amount nearly tripled in three weeks, and no deadline for payment. Unlike the first letter, though, the union made sure Mr. Lopez and the company received this one, hand-delivering copies of the document to both on November 1.

The parties disagree about what happened next. Mr. Lopez says he spoke with Mr. Lucero and that Mr. Lucero told him to contact the union's office manager, Patricia Martinez, to make arrangements for payment. Mr. Lopez insists that Mr. Lucero did not explain how the union calculated the amount due or provide a specific deadline for payment. For its part, the union says that Mr.

- 4 -

Lopez spoke over the phone to the union's Secretary Treasurer, Rudy Ortiz, who told him he had to pay $150 that week and another $150 the next week, or else he'd be fired.

It is undisputed, however, that Mr. Lopez did contact Ms. Martinez sometime between November 1 and November 5, and told her that he was able to pay $200 toward his past-due account. Ms. Martinez replied that this was "okay," and the following Friday, November 10, Mr. Lopez purchased a money order for $200. On Monday, November 13, Mr. Lopez called Ms. Martinez to tell her that he was planning on bringing the $200 money order to the union's main office in Colorado Springs that day. Ms. Martinez volunteered that Mr. Lopez "didn't have to go all the way to Colorado Springs" because Mr. Ortiz would be at the Pueblo office and Mr. Lopez could simply drop off the payment with him.

According to Mr. Lopez, when he arrived at the Pueblo office later that day it was locked and appeared unstaffed. So Mr. Lopez called Ms. Martinez to ask what he should do. Ms. Martinez told him to "go ahead and fill out the money order and throw it in the slot in the door." Mr. Lopez claims he did just that, though the union insists it never found the money order. Mr. Lopez also claims that he asked Ms. Martinez if he could have until Friday, November 17, to pay the remaining $215 sought by the union in its November 1 letter. According to Mr. Lopez, Ms. Martinez replied that he could have until Thursday, November 16, something Ms. Martinez does not dispute.

But the union didn't wait that long. Instead, on Tuesday, November 14, it contacted the company, and this time it unmistakably demanded Mr. Lopez's immediate discharge. Later the same day, Randy Espinoza, the company's General Foreman, walked Mr. Lopez off the job site. Mr. Espinoza explained to Mr. Lopez that he was acting on "strict orders from Rudy Ortiz to walk [Mr. Lopez] off the job because of [his] union dues." Despite having been fired, Mr. Lopez claims he paid the remaining $215 on Thursday, November 16, just as he and Ms. Martinez had agreed.

B

Upset with his firing and how it unfolded, Mr. Lopez complained to the union, the company, and the NLRB. Eventually, the union and company agreed to reinstate Mr. Lopez and the NLRB decided to press unfair labor practice charges against the union. The case was assigned to an Administrative Law Judge (ALJ), who accepted Mr. Lopez's testimony that he never received the October 12 letter, as well as Mr. Lopez's account of the events following his receipt of the November 1 letter. With those facts in hand, the ALJ proceeded to hold that the union violated the National Labor Relations Act (NLRA) on both November 1 and November 14.

First, the ALJ concluded that the union's November 1 letter violated Section 8(b)(1)(A) of the NLRA. Section 8(b)(1)(A) makes it an unfair labor practice for a union to "restrain, or coerce employees in the exercise of their

rights guaranteed in [Section 7 of the Act]," 29 U.S.C. § 158(a)(1); Section 7, in turn, affords employees the right to "refrain from any or all [union] activities," 29 U.S.C. § 157. The ALJ reasoned that the union violated Section 8(b)(1)(A) by threatening Mr. Lopez with immediate discharge without first explaining to him how it calculated his delinquency or offering him a reasonable period of time to cure that delinquency.

Second, the ALJ concluded that the union's actions on November 14, when it secured Mr. Lopez's discharge, likewise violated Section 8(b)(1)(A). The ALJ stressed that, even by this time, the union still had not explained to Mr. Lopez how it calculated the amounts it claimed were overdue. The ALJ also emphasized that, while the union had by then agreed to a payment plan with Mr. Lopez, it denied Mr. Lopez the chance to complete that payment plan, even though he was on track to do so. Separately, but relatedly, the ALJ found that the union's actions on November 14 violated Section 8(b)(2) of the NLRA, which makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee," 29 U.S.C. § 158(b)(2), in a manner aimed at "encourag[ing] or discourag[ing] membership in any labor organization," 29 U.S.C. § 158(a)(3). The ALJ reasoned that the union violated this provision by asking and persuading the company to fire Mr. Lopez without explaining to him

how it calculated the overdue amounts or affording him the chance to complete the agreed payment plan.[1]

The NLRB adopted the ALJ's decision and ordered the union to undertake certain remedial measures. Among other things, the NLRB ordered the union to make Mr. Lopez whole for any loss of pay or benefits, to remove from its files any reference to Mr. Lopez's unlawful discharge, and to take steps to avoid similar problems with other employees in the future. In response, the union filed a timely petition for review with this court, and the NLRB filed a cross-petition for enforcement of its order.[2]

---

[1] The ALJ declined to find that the union violated Section 8(b)(2) on November 1. Though the union's November 1 letter purported to ask the company to dismiss Mr. Lopez immediately, the union insists that it never sent the letter to the company or took any other steps at that time to secure Mr. Lopez's dismissal. The ALJ also found that the company knew the union had a practice of sending threatening letters to its members in order to coax them into paying, without really intending to seek their discharge. According to the ALJ, the company knew that the union would seek an employee's discharge only at a later time, as in this case, if its threatening letters failed to convince the employee to pay. This aspect of the ALJ's decision was not challenged before the NLRB and is not before us. Accordingly, we have no reason to pass on its propriety.

[2] At the time of its decision in this case, the NLRB enjoyed only two members, though it is statutorily entitled to five. Before us, the union has not questioned the NLRB's authority to issue decisions with only two serving members, though others have raised the question in other cases and obtained competing rulings from our sister circuits. *Compare Narricot Indus., L.P. v. NLRB*, 587 F.3d 654, 659 (4th Cir. 2009) (holding that two-member NLRB can issue decisions), *Snell Island SNF LLC v. NLRB*, 568 F.3d 410, 423-24 (2d Cir. 2009) (same), *New Process Steel, L.P. v. NLRB*, 564 F.3d 840, 845-46 (7th Cir. 2009) (same), *and Ne. Land Servs., Ltd. v. NLRB*, 560 F.3d 36, 41 (1st Cir. 2009) (same), *with Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469,

(continued...)

- 8 -

II

The Board has long read the NLRA as imposing certain fiduciary duties on unions that benefit from union-security agreements. The union in this case does not contest the NLRB's interpretation of the NLRA, but instead insists as a factual matter that it discharged all of its statutorily deduced fiduciary obligations. Before turning to assess that factual claim, we first necessarily pause to outline the nature of the fiduciary duties the union admits to owe and claims to have met.

A

The NLRA seeks to secure for employees the liberty to join unions — and not to join unions. In seeking to balance these sometimes competing objectives, Congress provided in Section 8(b)(1)(A) that unions may not restrain or coerce employees into engaging in union activities. 29 U.S.C. § 158(b)(1)(A). In Section 8(b)(2), Congress further prohibited unions from, among other things, seeking an employee's dismissal for lack of union membership. 29 U.S.C. § 158(b)(2).

---

[2](...continued)
472-73 (D.C. Cir. 2009) (holding that two-member NLRB cannot issue decisions). During the pendency of this appeal, two things have happened on this front: our court has joined those courts holding that two-member decisions are permissible, *see Teamsters Local Union No. 523 v. NLRB*, __ F.3d __, 2009 WL 4912300 (10th Cir. 2009), and the Supreme Court has indicated its intent to address the question, *see New Process Steel, L.P.*, 564 F.3d 840 (7th Cir. 2009), *cert. granted*, 130 S. Ct. 488 (Nov. 2, 2009) (No. 08-1457). At least for now, we are of course bound by our governing circuit precedent approving two-member decisions.

At the same time, Congress provided an "exception" to these rules in Section 8(a)(3). *NLRB v. Hotel, Motel & Club Employees' Union, Local 568*, 320 F.2d 254, 257-58 (3d Cir. 1963). Under that provision, a union representing employees in collective bargaining may negotiate and enter into a union-security agreement with the employer. 29 U.S.C. § 158(a)(3). Union-security agreements require represented employees to join the union and authorize the union to seek an employee's dismissal if he fails to keep current on his dues. Congress's reason for allowing these agreements, the Supreme Court has explained, is "that in the absence of a union-security provision many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost," essentially free-riding on the work of, and benefits provided by, the union and its paying members. *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 740-41 (1963) (internal quotation marks omitted).

Still, because union-security agreements afford the "union the formidable power to compel an employee's discharge," their enforcement is "strictly regulated." *Int'l Bhd. of Elec. Workers, AFL-CIO, Local No. 99 v. NLRB*, 61 F.3d 41, 43 (D.C. Cir. 1995) (quoting *Radio-Electronics Officers Union v. NLRB*, 16 F.3d 1280, 1286 (D.C. Cir. 1994)); *see also Gen. Motors Corp.*, 373 U.S. at 742. Relevant for our purposes, the Board has long interpreted Section 8(a)(3) to embrace a fiduciary duty on the part of the union, requiring it to "deal[] fairly with the employee" when enforcing its rights under a union-security agreement.

*Local 545, Int'l Union of Operating Eng'rs*, 161 NLRB 1114, 1121 (1966); *see also Philadelphia Sheraton Corp.*, 136 NLRB 888, 896 (1962), *enforced* 320 F.2d 254 (3d Cir. 1963). When a union adheres to this fiduciary duty, it lawfully operates within Section 8(a)(3)'s "carefully circumscribed" exception to Sections 8(b)(1)(A) and (b)(2). *Hotel, Motel & Club Employees' Union*, 320 F.2d at 258. When it fails to fulfill this obligation, however, it operates outside of the exception, and thus violates Sections 8(b)(1)(A) and (b)(2).

Among other things, before invoking the union-security clause against an employee, the union's obligation to deal fairly with employees requires it to: (1) provide the employee with actual notice of the precise amount due, including the months for which dues are owed; (2) explain how it computed the amount due; (3) give the employee a reasonable deadline for payment; and, (4) explain to the employee that failure to pay will result in discharge. *See, e.g.*, *Coopers NIU (Blue Grass)*, 299 NLRB 720, 723 (1990) (citing *Western Publishing Co.*, 263 NLRB 1110 (1982)); *Int'l Bhd. of Elec. Workers*, 61 F.3d at 43; *NLRB v. Local 1445, United Food & Commercial Workers Int'l Union*, 647 F.2d 214, 217 (1st Cir. 1981). Seeking an employee's discharge without first providing this sort of notice, the NLRB has held, violates Section 8(b)(1)(A) of the NLRA, because such behavior tends to "restrain or coerce" the employee from exercising his right to refrain from union membership. And it violates Section 8(b)(2) because such a

request amounts to an "attempt to cause an employer to discriminate against an employee" in violation of his right to refrain from union membership.

While violations of Sections 8(b)(1)(A) and 8(b)(2) often come in pairs, the NLRB has noted that they can come singly. For example, a union might threaten an employee with immediate discharge without first providing him with adequate notice of his delinquency or a reasonable opportunity to cure it, but then take no action toward carrying out its threat. Even assuming such conduct falls beyond Section 8(b)(2)'s ambit because it doesn't constitute an "attempt to cause an employer to discriminate against an employee," the NLRB has held it still violates Section 8(b)(1)(A) because of its tendency to "restrain or coerce" employees in union activity. *See Operating Eng'rs, Local Union No. 3*, 313 NLRB 25, 33 (1993).

Put differently, the union cannot threaten to do under Section 8(b)(1)(A) what it cannot actually do under Section 8(b)(2). *See Teamsters Local Union No. 122*, 203 NLRB 1041, 1041 (1973), *enforced*, 502 F.2d 1160 (1st Cir. 1974) (union's unlawful demand for termination constituted an 8(b)(1)(A) violation, while union's unlawful causing of termination constituted an 8(b)(2) violation). Thus, before it may threaten an employee with an adverse employment action, the union must afford him notice meeting all four requirements identified above. Neither does it make a difference whether the employee subjectively feels restrained or coerced by the union's threatening conduct: a violation occurs

- 12 -

whenever the union's conduct "reasonably tends to have a coercive effect." *Amalgamated Clothing Workers of America, AFL-CIO, Local 990 (Troy Textiles, Inc.)*, 174 NLRB 1148, 1151 (1969), *enforced*, 430 F.2d 966 (5th Cir. 1970). The relevant test, then, is an objective, not subjective, one.[3]

## B

On appeal to us, the union does not challenge these legal principles, but instead disputes the Board's factual finding that it engaged in conduct contravening them. In assessing such a challenge, we may ask only whether substantial, not uncontested or incontestable, evidence exists in the record to support the result the NLRB reached. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Under this standard of review, it is not our job to find facts afresh. Instead, we ask only whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support" the NLRB's decision. *Id.*; *see also Energy West Mining Co. v. Oliver*, 555 F.3d 1211, 1217 (10th Cir. 2009). In this respect, our job is something like the role of the instant-replay booth in football: the call on the field presumptively stands and we may overturn it only if we can fairly say that no reasonable mind could, looking at the facts

---

[3] The NLRB has suggested that the duty of fair dealing may be less rigorous when a union is seeking termination of a worker who has "willfully and deliberately sought to evade his union-security obligations." *Western Publishing*, 263 NLRB at 1113. In the proceedings before the ALJ and NLRB, the Union unsuccessfully argued that Mr. Lopez fit under this exception, but it does not raise the argument in this appeal, so we have no occasion to address the question.

again, stand by that call. So it is that we, like the instant-replay official, often affirm decisions that we might not have made ourselves. *See NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1028 (10th Cir. 2003).

1

Viewed in this light, we have no difficulty concluding that the NLRB's decision in this case should be sustained. The union's November 1 letter violated Section 8(b)(1)(A), as the NLRB held, because the union claimed the right and intent to seek Mr. Lopez's immediate dismissal without first discharging its fiduciary duties. The record unmistakably reveals that the November 1 letter (1) did not explain how the union calculated the amount owed, (2) did not purport to afford Mr. Lopez any (let alone a reasonable) deadline for payment, (3) yet, threatened Mr. Lopez with immediate discharge. Whether or not the union sent the letter to the company, and whether or not the company understood the letter to be a request to fire Mr. Lopez immediately, *see supra* note 1, there is no question that the letter had the reasonable tendency to cause an employee to fear that possibility. And a Section 8(b)(1)(A) violation arises whenever a union engages in conduct that would reasonably tend to coerce an employee into complying with its demands, without first discharging its fiduciary obligations toward that employee.

A similar story can be told of the union's conduct on November 14, when it arranged to have Mr. Lopez fired. The record contains ample evidence that, even

by this point, the union still had not explained to Mr. Lopez how it calculated his dues, or provided him a reasonable time period in which to make payment. In fact, there is evidence suggesting the union did just the opposite — first agreeing to a payment schedule with Mr. Lopez on November 13, and then having him fired the next day, before he could complete the agreed schedule and while he was on track to do so. Though some of this evidence is disputed, we cannot say that a "reasonable mind" had to reject it. And accepting this evidence leads unavoidably to the conclusion that the union violated both Section 8(b)(1)(A)'s prohibition against unduly restraining or coercing employees, as well as Section 8(b)(2)'s prohibition against causing an employer to fire an employee.

2

The union seeks to avoid these conclusions primarily by arguing that it discharged its fiduciary duties in its October 12 letter to Mr. Lopez. At least two problems attend this line of argument, however.

a

First, the ALJ credited Mr. Lopez's testimony that he did not receive the October 12 letter and, the ALJ held, the union could not have discharged its fiduciary duties to him by means of a letter he never received. The union asks us to overturn the ALJ's factual finding, insisting that Mr. Lopez must have received the October 12 letter because it affixed appropriate postage to the letter, properly addressed it to Mr. Lopez, and placed it in the United States mail. These facts,

the union urges us, should be enough for us to invoke the "mailbox rule" and presume that Mr. Lopez received the document.

The difficulty is that, even assuming without deciding that the NLRB was obliged to follow the common law "mailbox rule" in the course of its work (an issue the parties haven't explored), that "rule" is not the sort of immutable legal command the union suggests. Rather, it is simply an evidentiary presumption — a presumption that items placed in the United States mail normally arrive where they are directed because of the "probability that the officers of the [postal service] will do their duty." *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884). Even in 1884, when the Supreme Court decided *Rosenthal*, no one claimed perfection for the post office and the "mailbox rule" was and never has been more than a presumption that may be rebutted by other evidence suggesting that the addressee did not receive the letter. *See id.* at 193-94.

In fact, we have explained that, after a party makes a presumptive showing of receipt using the "mailbox rule," an opposing party's sworn denial of receipt can "create[] a credibility issue that must be resolved by the trier of fact." *Witt v. Roadway Express*, 136 F.3d 1424, 1430 (10th Cir. 1998); *see also S. Frederick Sansone*, 127 NLRB 1301, 1302 n.4 (1960). And that's exactly what occurred here. In this case, the ALJ, as trier of fact, received extensive and conflicting sworn testimony from both sides about the letter's mailing and receipt. Ultimately, he credited Mr. Lopez's testimony that he hadn't received the letter,

explained his reasons for doing so, and the Board adopted the ALJ's determination as its own. The record, moreover, contains other evidence supporting Mr. Lopez's sworn testimony that he didn't receive the October 12 letter — perhaps most notably that he took no action after the October 12 letter but acted immediately after receiving the substantially similar November 1 letter.

Under the substantial evidence standard governing our review of this case, we can insist on no more. We are required to look only for the existence of some evidence from which a reasonable mind could conclude as the NLRB did, and in doing so we take special care to remember that we "do not weigh the credibility of one witness against another nor do we search for contradictory inferences." *Osteopathic Hosp. Founders Ass'n v. NLRB*, 618 F.2d 633, 636 (10th Cir. 1980) (internal quotation marks omitted). Here, the ALJ heard live testimony from the various competing witnesses, found Mr. Lopez credible, explained his bases for doing so, and other record evidence tends to confirm that finding. Unavoidably, we must conclude substantial evidence exists to support the ALJ's finding as adopted by the Board.

b

Second, even supposing that Mr. Lopez did receive the October 12 letter as the union insists, it would make no difference. The deficiencies of the November 1 letter were equally present in, not cured by, the October 12 correspondence. Take for example the question of how the union calculated the amount Mr. Lopez

- 17 -

owed. The October 12 letter claimed that Mr. Lopez owed $145, but offered no explanation of how that amount was calculated, other than to say that $120 of the amount was attributable to "late dues" and $25 was attributable to "reinstatement fees." No explanation how the union calculated these numbers was included, nor any information about which months' dues were past due, as the NLRB requires. Compounding the problem, the October 12 letter claimed Mr. Lopez owed $145, but less than three weeks later the union sent its November 1 letter claiming Mr. Lopez owed $415 dollars. Though the digits in the two letters were the same, they were reshuffled and the amount due nearly tripled — with no explanation given to Mr. Lopez for the difference. Equally problematic, the October 12 letter did no better job than the November 1 letter in affording Mr. Lopez a reasonable deadline for payment: to the contrary, just like the November 1 letter, the October 12 letter purported to seek Mr. Lopez's immediate discharge. Far from fulfilling the union's fiduciary obligations, then, the October 12 letter failed those obligations, just as the November 1 letter had.

3

Even if the October 12 letter doesn't help its cause, the union argues that it told Mr. Lopez how his fees, dues, and any penalties would be calculated when he first joined the union in June 2006. From this information, the union submits, Mr. Lopez could have "figured out" how it arrived at the $415 figure mentioned in the

November 1 letter.  And, the union says, the NLRB has never required more than this for unions to discharge their fiduciary obligations.

The problem is that it has.  The NLRB has long held that, in addition to any duties the union owes to employees at the time of hiring, the union owes and must discharge the fiduciary obligations set forth above, *see supra* Part II.A, when it sets out to threaten, or take any action toward seeking, an employee's discharge under a union-security agreement.  Claims that the employee knew or could have gleaned information from other sources or earlier communications will not suffice to discharge these obligations.  As our sister circuit has explained, whether an employee already knows the information the union's fiduciary duties obliges it to provide "is irrelevant.  The Board has articulated a prophylactic rule that obviates the need to inquire into [the employee's] subjective knowledge" and focuses instead on the "bright-line" question whether the union itself has discharged its fiduciary functions. *Int'l Bhd. of Elec. Workers*, 61 F.3d at 44.  *See also Blue Grass*, 299 NLRB at 723; *NLRB v. Local 1445, United Food & Commercial Workers*, 647 F.2d at 217; *NLRB v. Constr. & Bldg. Material Teamsters Local No. 291*, 633 F.2d 1295, 1298-99 (9th Cir. 1980).  Neither has the union challenged the Board's substantial body of precedent on this score as an impermissible or unreasonable interpretation of the NLRA.  Accordingly, it is our duty to apply

those precedents faithfully, and doing so we cannot help but agree with the NLRB

that the union failed to abide them in this case.[4]

* * *

The union's petition for review is denied and the NLRB's cross-petition for

enforcement is granted.

---

[4]    Even if Mr. Lopez's subjective knowledge were somehow relevant, the union claims only that he had knowledge sufficient to allow him to calculate and understand his past due amounts.  It does not point to any record evidence that Mr. Lopez was ever told, at the time of hiring or otherwise, that he was entitled to a reasonable period to pay these overdue dues.  Meanwhile, on both November 1 and 14, the union purported to claim the authority to seek Mr. Lopez's immediate termination without affording him *any* reasonable opportunity to pay the overdue amounts.  That deficiency alone would suffice to support the NLRB's conclusion that the union violated Section 8(b)(1)(A) on November 1, and Sections 8(b)(1)(A) and (b)(2) on November 14.  *See Blue Grass*, 299 NLRB at 724; *Teamsters Local Union No. 122*, 203 NLRB at 1042.