# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 5, 2011

No. 10-60762
Summary Calendar

Lyle W. Cayce
Clerk

VEVRIA D. NELSON,

Petitioner

v.

NATIONAL LABOR RELATIONS BOARD; CORRECTIONS
CORPORATION OF AMERICA,

Respondents.

Petition for Review of an Order of
the National Labor Relations Board
Agency No. 26-CA-23180

Before REAVLEY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Vevria Nelson challenges the National Labor Relations Board's ("Board")
holding that the Corrections Corporation of America ("Corporation") did not
violate the National Labor Relations Act ("Act") when it terminated her. For the
reasons set out below, we DENY Nelson's petition.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-60762

I.    Facts and Proceedings

The Corporation operates correctional facilities throughout the United States, including a facility in Tutwiler, Mississippi, where it employs approximately 610 employees. In 2007, the Corporation secured a contract with the California Department of Corrections and Rehabilitation to house California inmates at the Tutwiler facility ("California Contract"). The California Contract is the Tutwiler facility's sole source of inmates and, due to litigation regarding deficient health care provided to California inmates, the facility is subject to a federal receivership appointed to monitor the delivery of health care to California inmates.

Nelson is a licensed practical nurse ("LPN") who worked at the Tutwiler facility from January 24, 2007 until her termination on August 1, 2008. While employed at the Tutwiler facility, Nelson frequently clashed with her coworkers. From 2007 through early 2008, several Tutwiler staff members filed the following incident reports or complaints against Nelson:

1.    In March 2007, a coworker filed an incident report alleging that Nelson yelled at her in a threatening manner.

2.    In August 2007, a nurse's assistant filed two separate reports alleging that Nelson shouted at her in a threatening manner on one occasion and threw away her personal property on another.

3.    In October 2007, a nurse filed a complaint that Nelson snatched medication out of her hand in front of several other nurses.

4.    Also in October 2007, two nurses filed complaints against Nelson, alleging that her "uncivil" and "rude, unprofessional" conduct created a "toxic work environment" and resulted in "low morale."

5.    In February 2008, Dr. Tankersley, a Tutwiler dentist, asked Nelson for some ibuprofen to give to an inmate.    The

2

No. 10-60762

conversation escalated into a shouting match and Registered Nurse ("RN") supervisor Albert Maples intervened. After Tankersley left the room, Nelson continued to shout at Maples, and Maples told Nelson that if she did not calm down he would send her home. Tankersley and Maples submitted complaints against Nelson detailing the incident.

6.   In April 2008, the Corporation conducted a training seminar where it asked Tutwiler medical staff to anonymously write down the name of any individual who was the source of conflict in the medical department. Thirteen of 16 employees put Nelson's name alone. Two employees named Nelson and other employees.

7.   In May 2008, a nurse filed an incident report against Nelson, alleging that Nelson shoved her and screamed at her during a confrontation.

8.   In July 2008, RN Dorothy Strong filed an incident report against Nelson, alleging that Nelson had made disparaging remarks about Strong in front of other nurses. In the report, Strong also noted that Nelson routinely made ugly remarks to or about RNs.

All of these incident reports were brought to the attention of Warden Robert Adams, who had overall responsibility for managing the facility.

In addition to the written complaints, Adams testified that he received numerous oral complaints about Nelson. Two departing RNs informed Adams that Nelson was one of the reasons they were leaving the Tutwiler facility. In April 2008, Maples told Adams that he was resigning due to stress and that Nelson had contributed to that stress. In June 2008, another RN, Deanna Hardin, stated to Adams that she was resigning "because of Nelson's behavior" but that she would consider returning if Nelson left. Adams did not, however, discipline Nelson for any of her conduct. Furthermore, in a 2007 performance evaluation, Nelson received an "Exceeds Expectations" rating.

No. 10-60762

In April 2008, an inmate death at the Tutwiler facility led to an investigation by the federal receiver in charge of California inmates. The next month, the receiver issued a scathing report concluding that the Tutwiler medical department had failed to comply with the receiver's rules and regulations. The report emphasized the Corporation's need to maintain and increase its medical staff, particularly its RNs. The receiver warned the Corporation that if it did not "immediately correct" the deficiencies, he would remove the California inmates from the Tutwiler facility.

After the July 2008 incident between Nelson and Strong, Adams discussed the various incidents involving Nelson with Managing Director Jack Garner and Vice President Jimmy Turner and recommended that the Corporation terminate Nelson. Adams testified that he made his recommendation in light of the receiver's warning because Nelson "was putting [the Corporation] in a position where [it] could lose [its] contract." Garner and Turner agreed with Adams's recommendation.

On August 1, 2008, Adams discharged Nelson. During the discharge meeting, Adams referred to prepared talking points and told Nelson: (1) that she "made complaints" and was "never satisfied with our answers"; (2) that Tutwiler staff, including some of her coworkers, had complained about her; (3) that the Corporation "was trying to secure the California contract"; and (4) that her "attitude" did not fit the environment the Corporation sought to maintain. Adams's talking points also specifically noted that Nelson's "behavior has contributed to or created difficult situations for [her] and others" and that "the quality of the medical care [the Tutwiler facility] is providing has been

4

No. 10-60762

questioned by our California customer and we are facing a very challenging situation."

On September 18, 2008, Nelson filed a charge against the Corporation before the Board alleging that she was terminated in retaliation for engaging in concerted activities protected by the Act. Over the course of 2008, Nelson performed three actions that could be considered concerted activities protected by the Act. In February 2008, Nelson filed an employee grievance against Maples, alleging discrimination based on race and sex. Three LPNs attached their own complaints about Maples to Nelson's complaint. In May 2008, Nelson and fourteen LPNs mailed a letter to the Corporation's Vice President of Health Services asking for a $5 per hour wage increase. In July 2008, Nelson and several LPNs spoke to human resources about bonuses.

After a hearing, an Administrative Law Judge ("ALJ") issued a decision in Nelson's favor. On August 23, 2010, the Board reversed the ALJ's decision.[1] The Board found that the ALJ had failed to, among other things, (1) give proper weight to the fact that the Corporation's California Contract was in jeopardy and (2) fully consider the impact that Nelson's conduct had on the Corporation's ability to employ RNs. The Board concluded that:

> While the [Corporation] may have tolerated [Nelson's] conduct in 2007, it could no longer do so in 2008, after learning that it could lose its California contract. Thereafter, the [Corporation] learned that Nelson's conduct threatened its ability to retain RNs and

---

[1] The Board originally reversed the ALJ's decision in an order issued on November 12, 2009. At the time, only two Board members were sitting on the Board. On June 17, 2010, the Supreme Court held in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that the Board required a quorum of three members in order to exercise its delegated authority. The Board, with three members sitting, subsequently issued a second opinion adopting and incorporating its previous order.

5

No. 10-60762

properly administer medical care to its inmates, two objectives critical in [its] effort to save its California contract. In response, the [Corporation] discharged Nelson. Accordingly, we find the discharge did not violate the Act.

Nelson timely filed a petition for review of the Board's order.

II.   Standard of Review

"We review the Board's factual findings under a substantial evidence standard." *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008) (citing *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 786 (5th Cir. 1997)). "The Supreme Court has defined substantial evidence as more than a scintilla. It means such relevant evidence as a reasonable mind would accept to support a conclusion." *Id.* (internal quotation omitted). As another circuit recently commented, under this standard:

> [O]ur job is something like the role of the instant-replay booth in football: the call on the field presumptively stands and we may overturn it only if we can fairly say that no reasonable mind could, looking at the facts again, stand by that call. So it is that we, like the instant-replay official, often affirm decisions that we might not have made ourselves.

*Laborers' Int'l Union of N. Am., Local 578 v. NLRB*, 594 F.3d 732, 739 (10th Cir. 2010).

When the NLRB does not accept the findings of the ALJ we have "an obligation to examine the evidence and findings of the Board more critically than [we] would if the Board and the ALJ were in agreement." *NLRB v. Fla. Med. Ctr., Inc.*, 576 F.2d 666, 674 (5th Cir. 1978). "Although this heightened scrutiny does not alter the substantial evidence standard of review, it does require us to apply it with a particularly keen eye, especially when credibility determinations are in issue . . . ." *Garcia v. Sec'y of Labor*, 10 F.3d 276, 280 (5th Cir. 1993).

6

No. 10-60762

III.   Discussion

The Act prohibits an employer from "interfer[ing] with, restrain[ing], or coerc[ing] employees" in the exercise of an employee's right to organize. 29 U.S.C. § 158(a)(1). To establish that the Corporation violated the Act, Nelson must satisfy a two-prong test. First, she "must make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Peter Vitalie Co., Inc.*, 310 NLRB 865, 871 (1993). "Once this is established, the burden shifts to the employer to demonstrate that it would have taken the same action even in the absence of the protected conduct." *Id.* The Corporation "cannot simply present a legitimate reason for its actions but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct." *Id.* We assume for the sake of argument, as did the Board, that Nelson presented evidence sufficient to establish a prima facie case.

On the administrative record before us, we conclude that substantial evidence supports the Board's finding that the Corporation would have fired Nelson even in the absence of the protected conduct. It is undisputed that the Corporation was in danger of losing the California Contract if it did not improve medical services at the Tutwiler facility, specifically by increasing the number of RNs at the facility. It is also undisputed that the Corporation received numerous written and oral complaints from other employees regarding Nelson's disruptive conduct. Given the steady stream of incident reports and complaints about Nelson and the fact that two departing RNs had specifically stated that Nelson contributed to their departure, the Corporation could have reasonably concluded that terminating Nelson was necessary to prevent other RNs from

7

leaving and to maintain the California Contract. Substantial evidence supported the Board's finding that Nelson's termination was motivated by the Corporation's efforts to save the California Contract.

Nelson argues that the Board's finding was in error because: (1) she had received good performance evaluations and a merit-based raise in spite of the incident reports; (2) some of the written incident reports filed against her were not validated after investigation; (3) she was not disciplined in response to the incident reports; (4) she was not informed of the specific complaints against her at her termination meeting; and (5) Adams did not investigate Scott's incident report against her. These arguments are unavailing. Nelson attacks each individual incident report as insufficient to support her termination, but in doing so she misses the point of the Board's finding. The Board did not base its finding on any one incident; it found that the Corporation terminated Nelson after looking at her repeated pattern of abusive behavior in the context of the threatened California Contract and the impact of her conduct on the RN staff. At most, Nelson's arguments could support an inference that the Corporation's stated reason for firing Nelson was pretextual. They do not, however, *require* such an inference. On the facts before us, we cannot say that "no reasonable mind could, looking at the facts again," agree with the Board's decision. The Board did not err in reversing the ALJ and dismissing Nelson's complaint.

IV.   Conclusion

For the foregoing reasons, Nelson's petition is DENIED.