FILED
United States Court of Appeals
Tenth Circuit

August 28, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PUBLIC SERVICE COMPANY OF
NEW MEXICO,

        Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

        Respondent/Cross-Petitioner.

Nos. 11-9536 & 11-9540

**PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(NLRB No. 28-CA-23148)**

Paula G. Maynes (Stephen B. Waller with her on the briefs), Miller Stratvert P.A.,
Albuquerque, New Mexico, for Petitioner/Cross-Respondent Public Service
Company of New Mexico.

Nicole Lancia, Attorney (Usha Dheenan, Lafe E. Solomon, Acting General
Counsel, Celeste J. Mattina, Acting Deputy General Counsel, John H. Ferguson,
Associate General Counsel, and Linda Dreeben, Deputy Associate General
Counsel, with her on the briefs), Washington, D.C., for Respondent/Cross-
Petitioner National Labor Relations Board.

Before **MURPHY**, **GORSUCH**, and **MATHESON**, Circuit Judges.

**GORSUCH**, Circuit Judge.

This case began with an angry bill collector, metamorphosed into a discovery dispute, and now serves mostly as another reminder about the importance of preserving your best arguments in the proper administrative forum rather than trying them for the first time in an appellate court.

I

It began with Robert Madrid. He worked for Public Service Company of New Mexico (PNM), collecting overdue bills for the electric utility. A tough job, to be sure, and one that apparently called for more patience than Mr. Madrid could muster on a bad day. Angered by a particularly obstinate customer and without his supervisor's permission, Mr. Madrid drove to the customer's home and disconnected the gas line. Bad enough, but what's worse is this: PNM didn't even provide the gas service, another utility did. Naturally, the delinquent customer wasn't happy and neither was Mr. Madrid's boss. Soon enough neither was Mr. Madrid, because though he owned up to his actions PNM fired him all the same, citing his violation of the company's ethics policy and state law.

But Mr. Madrid's dismissal marked only the beginning of things, spawning a tangled and now aging discovery dispute. Mr. Madrid's union decided to file a grievance on his behalf contesting his dismissal. The union argued that Mr. Madrid's firing violated its collective bargaining agreement with the company. For its part, PNM replied by pointing out that the agreement allows the company

to fire unionized employees for "reasonable cause." And how, PNM asked, could that possibly be missing here, when Mr. Madrid admitted his improper behavior?

The union replied with this theory. While Mr. Madrid's conduct was indisputably in violation of company policy and state law, the union hypothesized that he may have been treated more harshly than other employees guilty of similar things. And such disparate treatment would be enough, the union argued, to undermine any claim of "reasonable cause" for Mr. Madrid's termination.

The difficulty was, the union didn't have evidence for its theory, only a wish to conduct discovery to see if it might pan out. So the union sent PNM a request demanding documents showing whether and to what extent PNM had disciplined other employees who, like Mr. Madrid, violated the company's ethics policy or state law. It also asked for disciplinary information about two specific non-union supervisors, Dave Delorenzo and Kelly Bouska. The union apparently believed the pair were responsible for a gas leak in 2008 but might have been treated more leniently than Mr. Madrid.

These requests led to our discovery fight. PNM readily agreed to provide documents disclosing disciplinary actions taken against union employees, but it refused to provide information about discipline meted out on non-union workers. The company argued that information about non-union employees was "irrelevant." The company also claimed that the union's bargaining representative already possessed information about the treatment of Mr.

Delorenzo and Mr. Bouska pursuant to a confidential court order, and that the union's request for the information had no other purpose except to harass PNM.

Mr. Madrid's union representative disagreed and sought to persuade the company to his view. He sent a letter to PNM explaining that both union and non-union employees are subject to the same corporate ethics policy and the same New Mexico laws that served as the basis for Mr. Madrid's termination. And this, the union argued, made disciplinary information about non-union employees relevant to the question whether the company had treated Mr. Madrid unusually harshly. With respect to Mr. Delorenzo and Mr. Bouska, the union denied it ever received information about what discipline (if any) was imposed on the two as a result of the gas leak.

Still, none of this persuaded PNM to comply and so the litigation began. The union filed a charge with the National Labor Relations Board alleging unfair labor practices, and the case marched along for many months until a hearing could be held before an administrative law judge (ALJ). Then, on the eve of the hearing, PNM suddenly relented and handed over to the union all the information it wanted.

But even that wasn't the end of things. Because of its many months of delay, first the ALJ and then the Board found that PNM had engaged in an unfair labor practice in violation of 29 U.S.C. §§ 158(a)(1) and (5). Specifically and in the end, the Board concluded that: (1) PNM had a statutory duty to bargain

collectively in good faith; (2) this duty included the duty to provide information relevant to grievances pursued under the terms of a collective bargaining agreement; (3) the information sought here was relevant to a grievance; (4) the union did not already possess disciplinary information about Mr. Delorenzo and Mr. Bouska; (5) the information request was made in good faith and not to harass PNM; and (6) PNM's delay in providing the information was unreasonable. *Public Serv. Co. of N.M.*, 356 N.L.R.B. No. 160, slip op. at 5-7 (May 24, 2011). As remedy, the Board ordered PNM to post a notice informing employees of their rights under the law, PNM's violation, and the company's promise to do better going forward. *Id.* at 8-10.

Naturally enough, PNM now petitions us for review of the Board's decision and the Board cross-petitions asking us to enforce its order.

II

And that takes us to the reminder about preservation, because in this case much more isn't before us than is. PNM does not dispute it had a duty to provide the union with relevant information in connection with grievances filed under the terms of the collective bargaining agreement. It does not dispute the Board's finding that PNM's delay in responding to the union's request was unreasonably long. And PNM does not claim that the union's discovery request was overbroad, unduly burdensome, or an invasion of the privacy interests of its employees — all of which may, at least under some circumstances, excuse a company's obligation

to provide the information under the National Labor Relations Act. *Safeway Stores, Inc. v. NLRB*, 691 F.2d 953, 956-57 (10th Cir. 1982). Instead, the only question the company raises before us and the only one we have to decide is whether the disciplinary information about non-union employees was "relevant" to the union's processing of Mr. Madrid's grievance.

And even on that question, far less confronts us than first meets the eye. That's because the most significant "relevance" objections PNM seeks to press in this court never made their way into the proceedings before the Board. And under 29 U.S.C. § 160(e), that's a problem: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." *See also NLRB v. L&B Cooling, Inc.*, 757 F.2d 236, 240 (10th Cir. 1985).

To determine whether § 160(e)'s "objection" requirement is satisfied, we ask this question: was the matter the petitioner seeks to raise here pressed before the Board with "sufficient specificity and clarity" so the tribunal was aware it needed to be addressed and could become the subject of litigation in this court? *NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1034 n.8 (10th Cir. 2003) (quotation omitted); *see also Teamsters Local Union No. 435 v. NLRB*, 92 F.3d 1063, 1072 (10th Cir. 1996). We ask this question because, whatever else § 160(e) may be designed to do, it's plain from its face that it seeks to allow the

agency at least the chance to apply its expertise to a problem before it comes to us. *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256 (1943) (the statute promotes "the salutary policy . . . of affording the Board opportunity to consider on the merits questions to be urged upon review" in court); *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 389 (1946) (same).

Applying this rule, we can divide PNM's appeal into two parts: the set of objections it managed to preserve and the rather larger set it did not.

A

Taking the first group first, it's clear enough that PNM lodged at least one clear and specific objection. It clearly argued that the union already possessed disciplinary information about Mr. Delorenzo and Mr. Bouska and sought information about their treatment only to harass the company. Admin. Record Vol. III Ex. 3 pp. 2-3. That part of PNM's appeal, without doubt, we may hear.

But with respect to the remainder of the objections PNM wishes to pursue in this court, here is all it said to the Board:

> PNM makes exception to the ALJ's analysis and conclusion that PNM was under a duty to provide information for non-bargaining unit employee discipline 'in the case of possible relevance.' [ALJ Op.] p. 7, ll. 2-38, Conclusions of Law Nos. 4 and 5. Non-bargaining unit employee discipline does not 'concern subjects directly pertaining to the bargaining unit' and the ALJ failed to assign the burden of proof of relevance to the Union as required by law.

Admin. Record Vol. III Ex. 3 p. 1.

Given the terseness of this two-sentence objection and its failure to cite any legal authority, the Board might have been within its rights to consider it insufficient for any purpose. *See* 29 C.F.R. § 102.46(b)-(c). But the Board didn't go down that road. Instead, it chose to address the two objections it felt it could discern lurking here: PNM's claim that (1) information about the discipline of (or failure to discipline) non-union employees is irrelevant because non-union employees aren't "similarly situated" to union employees, and (2) the union was obliged to explain clearly the relevance of its information — and to do so at the time it issued its request and not just after the fact at an administrative hearing.

We believe PNM's submission was (just) enough to preserve these two relevance objections. PNM's submission discusses each of them, if with painful brevity. And the company's references to portions of the ALJ's opinion help put a little more meat on the bone, directing the Board to the specific reasoning the ALJ offered on these particular issues. *See Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 418 (D.C. Cir. 1996) (the fact that "the ground for the exception [is] evident by the context in which the exception is raised" helps demonstrate the objection sufficiently put the Board on notice) (quotation omitted). The Board's opinion, too, suggests it fully understood both the nature and scope of these two specific objections. Whether or not each of these things alone might be sufficient, in light of them collectively we hold PNM's submission presents qualifying "objections" on these two issues under § 160(e) by providing

sufficient specificity and clarity to allow the Board to bring its expertise to bear. *See Interstate Builders*, 351 F.3d at 1034 n.8 (asking whether the "Board [was] aware" of the need to decide an issue); *Consolidated Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981) ("In each case, the critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal.").

B

These, however, are not the only relevance objections PNM seeks to pursue before this court. To the contrary, the company seeks to pursue a number of others.

By way of example, PNM advances a forceful argument that whether it treated Mr. Madrid differently from other employees (unionized or not) is irrelevant because the collective bargaining agreement doesn't prohibit differential discipline. In its view, the collective bargaining agreement allows the union to grieve only "the application of a specific policy to a specific employee," not PNM's termination practices more broadly. And, the company submits, there's no question that this specific employee was subject to termination. The collective bargaining agreement allows it to fire union members for "reasonable cause" and, PNM argues, Mr. Madrid's conduct certainly amounted to that. Besides and in any event, PNM submits, the right to fire employees for "reasonable cause" is merely an *example* of PNM's management power and not a

limitation, so it was entitled under the agreement to fire Mr. Madrid even *without* reasonable cause.[1]

Alternatively, PNM argues that even if differential treatment could amount to a violation of the collective bargaining agreement, and even if the union had sought to explain the relevancy of its request to issues covered by the parties' collective bargaining agreement, NLRB precedent requires the union to make at least some evidentiary showing that differential treatment exists before it is entitled to discovery. Fishing expeditions, it argues, are off limits. PNM points to *United States Postal Service*, where the Board held that "the burden of demonstrating relevance is not carried by a showing of a common disciplinary standard and a 'mere suspicion' that there may exist some evidence of supervisory misconduct similar to that involved in the grievance." 310 N.L.R.B. 701, 702 (1993). And, PNM argues, this case is on all fours with *Postal Service*: before asking for records about other employees, the union presented nothing more than speculation that anyone else committed violations meaningfully similar to Mr. Madrid's.

---

[1] To be sure, PNM argued to the Board that a separate provision of the collective bargaining agreement granted it exclusive power to "determine the qualification and select its [non-union] managerial and supervisory employees." Admin. Record Vol. III Ex. 3 p. 1. But that's not the same objection at all. Before this court, PNM seeks to suggest its discipline even of *union* members is irrelevant. Before the Board, PNM asserted the irrelevancy only of information pertaining to *non-union* managers and supervisors.

Alternatively still, PNM asserts (albeit without much explanation) that the fact the union waited four months after filing Mr. Madrid's grievance before issuing its request for information shows the union didn't think the information relevant.

The trouble is, we have no authority to hear these objections because PNM never presented them to the Board. Not a word hinting at them appears in PNM's spartan administrative submission. And while agency silence may not always be dispositive of the question whether a party objected (after all, agencies sometimes fail to respond to the arguments put to them and they sometimes do things no one asks of them), the Board's failure to respond to these arguments in an otherwise thorough opinion suggests it, too, didn't understand them to be in play.

Neither does the fact PNM *did* file three *other* qualifying § 160(e) relevance objections before the Board mean it may pursue on appeal any other tangentially related objections it wishes. The statute speaks of the need to present each objection in the singular: "*No objection* that has not been urged before the Board. . . shall be considered by the court, unless the failure or neglect to urge *such objection* shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e) (emphasis added). And of course the statute's point — to provide the Board with the chance to pass on each objection before litigation ensues in this court — would be undone if one objection could sweep in others hidden under its skirt. *Consolidated Freightways*, 669 F.2d at 793 ("[A] party who has

- 11 -

limited his objections before the Board to one issue will not be allowed to raise a different issue on appeal.").

So it is that both § 160(e)'s formal requirement (the rule a party must raise any objections to the Board it wishes to pursue here) and its substantive aim (seeking to afford the Board sufficiently clear notice of the need to address those objections so it might bring its expertise to bear before we take up the matter) are unmet and we may not hear PNM's newly minted objections, whatever their merits may be.

Still, there's yet one more wrinkle to this preservation business. In its briefs to this court, the Board disputes our authority to hear some of PNM's previously unvoiced objections, but it overlooks other arguments that were also unpreserved. So if § 160(e) merely provided the Board with an affirmative defense, we might find the Board's failure to assert it here a fatal flaw, a "waiver of the waiver," so to speak.

In § 160(e), however, Congress didn't just enact a waivable affirmative defense. It imposed a jurisdictional limit on the authority of this court, a limit we must attend to even if the Board hasn't. *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1182 (10th Cir. 2000); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Indeed, both the Supreme Court and this court have long held that § 160(e) is a non-waivable jurisdictional bar to consideration of objections not presented to the Board. *See Facet Enterprises, Inc. v. NLRB*, 907 F.2d 963, 970

(10th Cir. 1990); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665 (1982).

Of course, we must be wary about the word "jurisdiction." In the years since *Facet Enterprises* and *Woelke*, the Supreme Court has repeatedly warned lower courts against confusing "claim-processing rules or elements of a cause of action" with true "jurisdictional limitations." *Reed Elseiver, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243-44 (2010); *see also Arbaugh*, 546 U.S. at 510; *Bowles v. Russell*, 551 U.S. 205, 214 (2007); *Scarborough v. Principi*, 541 U.S. 401, 413 (2004). Many defenses, objections, and rules may limit a party's ability to present an argument, but it's a glib mistake to conflate them with rules categorically (jurisdictionally) precluding a federal court from hearing a matter.

But even mustering the appropriate skepticism and eyeing § 160(e) narrowly, it still appears to us a true jurisdictional limit. A statute imposes a jurisdictional limit on the courts when it "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Reed Elseiver*, 130 S. Ct. at 1243 (quotation omitted). And § 160(e) does the former. Its prohibition against entertaining unpreserved arguments appears in the same statutory section that grants the court of appeals jurisdiction to review NLRB orders. *See* 29 U.S.C. § 160(e) ("Upon the filing of [a] petition [by the Board to enforce its order], the court shall . . . have jurisdiction of the proceeding and of the question determined therein[.]"). And the relevant prohibition appears in the very sentence after the

grant of authority to this court. All this distinguishes § 160(e) from many non-jurisdictional requirements "located in . . . provision[s] separate from those granting federal courts subject-matter jurisdiction." *Reed Elseiver*, 130 S. Ct. at 1245-46 (quotation omitted); *see also Arbaugh*, 546 U.S. at 514-15. What's more, the language of § 160(e) speaks to the power of the reviewing *court*, a fact that distinguishes it from many non-jurisdictional requirements addressed only to the *parties*.[2] Given all this, and even bearing well in mind the Court's recent cautionary notes, we are confident that § 160(e) is a jurisdictional limit on this court's authority, just as *Facet Enterprises* and *Woelke* said it was. *See Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1328-30 (D.C. Cir. 2012) (reexamining precedent in light of recent Supreme Court decisions and reaching the same conclusion).

---

[2] *Compare* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be *considered by the court*." (emphasis added)) *with Reed-Elsevier*, 130 S. Ct. at 1241 (holding non-jurisdictional a requirement that "no civil action for infringement of the copyright . . . shall be instituted" until certain statutory requirements are met); *Jones v. Bock*, 549 U.S. 199, 204 (2007) (holding non-jurisdictional a requirement that "no action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted"); *Eberhart v. United States*, 546 U.S. 12, 13 (2005) (holding non-jurisdictional a requirement that "any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty").

III

And this leaves us with little we can do to help PNM.  We can reach the merits only of its three preserved objections — and these, it comes quickly clear, are not PNM's best.

We begin with the company's first preserved objection — that information about the discipline of non-union employees is categorically irrelevant because they aren't "similarly situated" to union employees.  In approaching this objection, we readily acknowledge that non-union employees are not always relevant comparators with their unionized counterparts.  After all, collective bargaining agreements often impose different standards for the treatment of union workers than for others, and this can make comparisons between the two groups difficult.  *See generally Holiday Inns, Inc.*, 317 N.L.R.B. 479, 481 (imposing a presumption of relevance to information sought about the treatment of union employees but no such presumption to information sought about the treatment of non-union workers).

The difficulty for PNM is that the particular rules serving as the basis for Mr. Madrid's termination — especially the company's ethics policy — apply to union and non-union employees equally.  *See Public Serv. Co. of N.M.*, 356 N.L.R.B. No. 160, slip. op. at 6.  And before the Board at least, PNM identified no way in which the fact one is or isn't a union member might make a

disciplinary difference when it comes to violating the company's policy. By all lights, everyone must behave ethically at PNM or suffer the same consequences.

PNM replies by suggesting that the irrelevance of non-union disciplinary information is illustrated by the Board's decision in *Equitable Gas Company*, 227 N.L.R.B. 800 (1977). There, the union asked for absentee records for other employees as part of an effort to grieve a union member's suspension for taking leave without approval. *Id.* at 801. The Board held the requested information irrelevant because the union member wasn't suspended merely for being absent from work but for being absent *without leave*. *Id.* at 801-02. The problem in *Equitable Gas*, thus, was that the requested records didn't even bear on the question asked — whether the union member and others were treated the same or differently. The union complained about apples but asked for information about oranges. Here there's no such comparable problem with the comparables: as far as anyone can tell from the (preserved) arguments, the records the union sought bore directly on the theory it sought to prove.[3]

---

[3] To be sure, PNM tries to get around this problem by referring to its claim that the union had a duty to provide evidence of differential treatment, not just speculation, before obtaining discovery about non-union comparators. But this is a different argument than saying PNM's request for information about non-union employees is categorically irrelevant to issues covered by the parties' collective bargaining agreement, whatever the evidence of differential treatment might be. It is also, as we've already explained, one of those arguments PNM never raised before the Board and so has long since lost.

Turning to PNM's second preserved objection — that the union had to explain the relevance of the requested information to an issue covered by the collective bargaining agreement, and to do so at the time the request was made and not just after the fact at an administrative hearing — there's a kernel of truth here, too. After all, NLRB precedent expressly requires the union to explain its relevance theory to the company "at the time the information request was made" rather than waiting until a Board hearing to concoct one. *See Disneyland Park*, 350 N.L.R.B. at 1259.

The problem is, the record before us contains substantial evidence that the union *did* timely apprise PNM of the basis for its request. Shortly after PNM refused to provide any information about the discipline of non-union employees, Mr. Madrid's union representative, Ed Tafoya, sent a letter detailing the basis for the request. He explained that the union wanted to investigate the possibility that other workers had been treated more leniently than Mr. Madrid, and that the request went to whether PNM had acted "evenhandedly" and "without discrimination." *See Public Serv. Co. of N.M.*, 356 N.L.R.B. No. 160, slip. op. at 3-4. He also pointed out that all of PNM's employees were subject to the same state laws and corporate ethics policy, and so union and non-union employees are in that respect "similarly situated." *Id.* at 6. All this was more than sufficient to support the Board's decision that PNM was reasonably informed about the grounds of the union's request at the time it was made.

In its final preserved objection, PNM claims the union's request was motivated not by a desire to obtain relevant information but by another, improper purpose. Recall that the union not only made a general request for disciplinary information, but also specifically sought information about the discipline meted out on Dave Delorenzo and Kelly Bouska after their alleged violations of company policy led to a gas leak in 2008. PNM asserts that Mr. Tafoya, the union representative, already knew about the disciplinary action taken against Mr. Delorenzo and Mr. Bouska because Mr. Tafoya had participated in the administrative proceedings investigating the leak. And, the company says, the information Mr. Tafoya obtained during the gas leak investigation was subject to a protective order. According to PNM, Mr. Tafoya wanted a way around the protective order so he could release publicly the information about Mr. Delorenzo and Mr. Bouska, perhaps to embarrass the company for failing to take more severe disciplinary action against the pair. And Mr. Madrid's case, the company says, was just the fig leaf cover Mr. Tafoya needed to accomplish this.

But whatever other problems may attend PNM's theory, the Board expressly found Mr. Tafoya credible when he testified that, though he knew the two men had committed violations of company and state rules, he was never told whether either had been disciplined for his misconduct. *Public Serv. Co. of N.M.*, 356 N.L.R.B. No. 160, at 4. Mr. Tafoya's testimony is also partially corroborated by the fact that PNM's "attorney conceded, during the hearing" that none of the

documents offered by PNM clearly showed that Mr. Tafoya was told about the discipline imposed on Mr. Delorenzo and Mr. Bouska. *Id*. at 5, n.14. Certainly on its face this appears to be "substantial evidence" that Mr. Tafoya didn't already know what happened to the pair. *Laborers' Int'l Union, Local 578 v. NLRB*. 594 F.3d 732, 739 (10th Cir. 2010). After all, our job is not to decide the facts for ourselves as if we were the first to come to it, but only to ask whether on the record before us any "reasonable mind" could make the finding the Board has already made. *Id*. (quotation omitted).

Neither for its part does PNM offer us any persuasive reason to think the Board's finding about Mr. Tafoya's state of knowledge is one no reasonable mind could accept. In fact, the company never even mentions the Board's factual finding in its briefs but instead essentially just reargues the facts to us as if we could decide them afresh. Given that shortcoming, we are hardly able to undo the Board's judgment. It is, after all, PNM's burden to do much more than to reargue the facts. It must go a step farther and "show affirmatively" that the Board's findings are ones no reasonable mind could accept. *Brown v. Comm'r*, 448 F.2d 514, 517 (10th Cir. 1971). And this heavy burden PNM has not even attempted to carry.[4]

_____

[4] In its reply brief, PNM also claims that information about Mr. Delorenzo and Mr. Bouska was irrelevant because their misconduct was not sufficiently similar to Mr. Madrid's retaliatory actions. Like much else, this portion of the argument was neither presented to nor addressed by the Board and we are without

(continued...)

IV

PNM's preserved arguments fail on their merits and PNM's unpreserved arguments we cannot hear, however meritorious they may be. Congress has given the courts only the power to help those who help themselves by developing their best objections during the administrative process, rather than waiting until it's all over and the case is on appeal. PNM's petition for review is denied. The Board's cross-petition for enforcement of its order is granted.

---

[4](...continued)
authority to entertain it.