**PUBLISH**

FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**February 28, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

CORESLAB STRUCTURES
(TULSA), INC.,

      Petitioner/Cross Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent/Cross Petitioner.

----------------------------------------

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL 627, AFL-CIO,

      Intervenor.

Nos. 23-9502, 23-9505

_____

**Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board
(NLRB Nos. 14-CA-248354, 14-CA-248812)**

_____

Christopher C. Murray of Ogletree, Deakins, Nash, Smoak & Stewart, P.C. of
Indianapolis, Indiana (Daniel A. Adlong and Henry Bryce Farrington of
Ogletree, Deakins, Nash, Smoak & Stewart, P.C. of Costa Mesa, California,
with him on the briefs), for Petitioner/Cross Respondent.

Joel Heller (Elizabeth A. Heany, Ruth E. Burdick, Jennifer A. Abruzzo, Peter
Sung Ohr, and David Habenstreit with him on the briefs) of the National
Labor Relations Board, Washington, D.C., for Respondent/Cross Petitioner.

Steven R. Hickman of Fraiser, Fraiser & Hickman, LLP of Tulsa, Oklahoma, for Intervenor.

_____

Before **HARTZ**, **TYMKOVICH**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Coreslab Structures petitions for review of a National Labor Relations Board decision finding it violated several provisions of the National Labor Relations Act. Exercising jurisdiction under 29 U.S.C. § 160(e) and (f), we grant in part and deny in part Coreslab's petition for review, deny the Board's cross-petition for enforcement, and remand to the Board for further proceedings.

**I**

**A**

Coreslab produces bridge components and other structural materials at its facility in Tulsa, Oklahoma.[1] From 2004 until 2019, Coreslab recognized the International Union of Operating Engineers, Local 627, AFL-CIO (the Union) as the bargaining representative of the company's production and maintenance employees.

_____

[1] We draw these facts from the Board's order. We address Coreslab's challenges to these findings in Section II.

2

Coreslab and the Union executed their first collective-bargaining agreement in 2005. That agreement and the agreements that followed required Coreslab to make pension contributions to a Central Pension Fund. Under Article XVI of the collective-bargaining agreement at issue here, Coreslab had to pay a certain amount into the Central Pension Fund for "all hours worked" by unit employees.

But beginning in 2011, Coreslab made pension contributions only for hours worked by *unit employees who were members of the Union*—about twenty-five percent of the total of unit employees. In lieu of pension contribution payments, Coreslab provided annual profit-sharing payments to non-Union bargaining unit employees. These profit-sharing payments were not included in the collective-bargaining agreements. Nor were they provided to Union employees. Some Union-member employees, including Union steward Floyd Prince, became aware of this dual-track pension/profit-sharing system as early as 2011. But Coreslab did not inform Union President Jason Evans, Union Business Manager Michael Stark, or the two business agents who helped Mr. Evans negotiate the 2015-2019 agreement, until 2019.

In March 2019, Coreslab received notice from the Central Pension Fund that the Fund would conduct a random compliance audit for Coreslab's pension contributions over the past three years. Eventually, that

audit revealed Coreslab underpaid the Fund by roughly $120,000 during the 2016 to 2018 period. This underpayment, the audit determined, was due to the exclusion since 2011 of hours worked by non-Union bargaining unit employees from Coreslab's calculations of its obligations to the Fund. The audit results became available to Coreslab in mid-July 2019. Shortly after, the company informed the Union of the audit's basic conclusion—Coreslab owed the Central Pension Fund money—but it did not tell the Union how much money was owed or the cause of underpayment.

In a separate July incident, Mr. Evans was speaking with a new hire in the Coreslab facility's breakroom. While not yet a permanent employee, the new hire was signing an authorization for Union representation. A plant manager, Danny Johnson, interrupted their conversation, and directed the new hire not to speak with the Union. Mr. Johnson apparently believed temporary employees had no right to speak to the Union; Mr. Evans explained "that wasn't the law, and . . . wasn't the way it worked." AR.136. After this brief exchange, both the new hire and Mr. Johnson left the breakroom.

Since April 2019, meanwhile, Mr. Evans had been attempting to schedule bargaining sessions with Coreslab general manager Neil Drews to negotiate a successor collective-bargaining agreement. Mr. Drews cancelled further meetings after a brief session in the spring, and delayed bargaining

4

in response to at least six requests from Mr. Evans during the early summer of 2019. The parties finally met in late July 2019, when Coreslab proposed the cessation of the pension benefit program. The company did not inform Mr. Evans that Coreslab had already terminated its pension payments for non-Union employees.

To provide employees with Coreslab's view of the flagging bargaining efforts, Mr. Drews met with company employees in late August. He mentioned the audit results and shared his view that one impediment to progress was the audit's conclusion the company owed money. "Any money that the company may owe," Mr. Drews warned, would "be paid to the pension fund and not the employees." AR.1626. If the employees were not Union members, he continued, they would receive no benefit from the "extra" contribution the company was being forced to make, AR.1626, and they would "be forfeiting the profit sharing" payments, AR.1640.

At the third bargaining session on September 6, 2019, Mr. Drews told Mr. Evans for the first time that Coreslab had not been making pension contributions to the Central Pension Fund for non-Union bargaining unit members. Instead, non-Union employees were permitted to participate in a profit-sharing plan. Shortly after the meeting, the Union requested information about Coreslab's profit-sharing plan; Coreslab declined to

5

provide some of the requested information, including the 401(k) plan prospectus and the calculation bases for profit-sharing eligibility.

On September 11, Mr. Drews received a disaffection petition signed by 18 of the 26 bargaining-unit employees. The petition indicated the undersigned employees no longer wished to be represented by the Union.

The next day, Mr. Drews withdrew tentative agreements reached during the three bargaining sessions. Mr. Drews rejected an additional information request from the Union received on September 16 about the company's 401(k) and profit-sharing plans. He explained that information was not relevant because it only concerned plans "taken off the table . . . on . . . September 12, 2019." AR.1626.

Disaffection petition in hand, Mr. Drews informed the Union on September 24 that Coreslab would be withdrawing its recognition when the current collective-bargaining agreement expired on September 30, 2019. Mr. Drews refused requests for further bargaining sessions, and Coreslab ceased recognizing the Union on October 1.

**B**

The National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, protects the right of employees "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 8 of the Act makes unlawful a number of unfair labor practices. Among them, employers may not

6

"interfere with, restrain, or coerce employees" in the exercise of protected rights, 29 U.S.C. § 158(a)(1), discriminate "in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3), or "refuse to bargain collectively with the" employee representatives, 29 U.S.C. § 158(a)(5). To effect these rights, the National Labor Relations Board "is empowered . . . to prevent any person from engaging in any unfair labor practice . . . affecting commerce," 29 U.S.C. § 160(a), after the filing of a charge and investigation by the Board and its agents, 29 U.S.C. § 160(b).

## C

Based on charges filed by the Union, the General Counsel of the NLRB issued a complaint against Coreslab. He alleged the company's conduct constituted unfair labor practices under three provisions of the Act. Coreslab, the General Counsel urged, violated 29 U.S.C. § 158(a)(5) by: unilaterally modifying its agreements with the Union, failing to make pension contributions required by the collective-bargaining agreement, initiating a profit-sharing payment program for non-Union employees, ceasing all pension fund contributions after the 2015–2019 agreement expired, failing to bargain with the Union in good faith, and withdrawing recognition of the Union. He alleged Coreslab discriminated between Union and non-Union employees by providing profit-sharing payments to the

latter and not the former, in violation of § 158(a)(3). And he identified as violative of § 158(a)(1) Mr. Johnson's direction to an employee not to speak with the Union.

In February 2021, the administrative law judge (ALJ) assigned to the case largely agreed with the General Counsel and found Coreslab violated 29 U.S.C. § 158(a)(1), (3), and (5).

That decision was upheld, in relevant part,[2] by the Board.

First, the Board rejected Coreslab's contention the Union had actual or constructive knowledge of the disparate compensation plans. AR.1621. While the Board refused the ALJ's characterization of the pension and profit-sharing plans as "secret" or "covert," AR.1621 n.7, it declined to

---

[2] While the Board and the ALJ agreed the Union lacked knowledge of the pension and profit-sharing plans, the Board pointedly did "not rely on the [ALJ's] characterization of [Coreslab's] unlawful pension and profit-sharing conduct as 'secret' and 'covert.'" AR.1621 n.7.

Coreslab makes much of this disagreement in its petition for review, insisting it "demonstrat[es] a lack of substantial evidence." Opening Br. at 15. If Coreslab means this disagreement is part of the complete record on review, it is, of course, correct. But if Coreslab intends to suggest contradictory findings between the Board and an ALJ indicate a lack of substantial evidence *per se*, we reject that contention. Our "standard of review is not altered when the ALJ and the Board reach contrary conclusions." *Medite of N.M., Inc.* v. *NLRB*, 72 F.3d 780, 785 (10th Cir. 1995) (quoting *Harberson* v. *NLRB*, 810 F.2d 977, 983 (10th Cir. 1987)). The record, however, will include the ALJ's findings, "whether they contradict or support the Board's determination." *Id.*

impute Mr. Prince's knowledge of the plans to the Union itself (as required by Coreslab's actual-knowledge argument) or to find Mr. Evans had failed to exercise basic diligence that would have revealed Coreslab's actions (as required by Coreslab's constructive-knowledge argument), AR.1621–23.[3]

On the merits, the Board found Coreslab violated § 158(a)(1) when Mr. Johnson prohibited an employee from speaking with Union representatives during non-working hours in a non-working area. It concluded Coreslab violated § 158(a)(3) by "discriminatorily failing to make pension contributions on behalf of unit employees because they were not members of the Union," and, conversely, "discriminatorily excluding unit employees who were members of the Union from [the company's] profit-sharing plan because of their membership in the Union." AR.1629–30. Failing to make pension contributions and adding the profit-sharing

---

[3] Board Member Ring dissented from this portion of the Board's decision. Member Ring would have held Mr. Prince's knowledge of the alternative compensation scheme—and Coreslab's apparently open practice of the profit-sharing program—gave the Union actual knowledge of Coreslab's benefits practices. Member Ring also concluded the Union had constructive knowledge, based on the practice's longevity, and its implication of a "a key economic term of the collective-bargaining agreement." AR.1635. Based on this reasoning, Member Ring dissented from the majority's conclusion Coreslab "violated [§ 158(a)(5)] by modifying the 2015-2019 collective-bargaining agreement and by unilaterally implementing profit-sharing payments." AR.1636.

program, the Board determined, were also unlawful, unilateral contract modifications barred under § 158(a)(5).

The Board further concluded Coreslab had violated § 158(a)(5) "by failing and refusing to furnish the Union with requested relevant information," "failing and refusing to bargain in good faith with the Union," "withdrawing recognition from the Union" based on a tainted disaffection petition, and ceasing pension contributions for *all* unit employees after September 30, 2019. AR.1630.

To remedy these violations, the Board required Coreslab to make pension contributions for *all* unit employees, regardless of Union status, and to include Union members within the profit-sharing program. The company was ordered to "[m]ake all delinquent payments to the Central Pension Fund," and to "[m]ake all current and former unit employees who were excluded from [Coreslab's] profit-sharing plan . . . whole for any loss of earnings and other benefits." AR.1632. The Board directed Coreslab to provide these make-whole remedies "without an offset for the benefits [the employees] were already receiving." AR.1630 n.32, 1632. Coreslab also was ordered to re-recognize the Union, provide it with the information needed as "collective-bargaining representative of [Coreslab's] unit employees," and bargain for a successor agreement in good faith. AR.1632. And

unilateral changes, like the profit-sharing program, were to be rescinded "[o]n request by the Union." AR.1632.

## II

Coreslab assails the Board's unfair-labor-practice findings on multiple fronts. It argues the profit-sharing plan was implemented openly and without anti-union animus. It maintains it did not violate the Act "by failing to make pension contributions for unit employees who were not Union members and excluding those who were Union members from its profit-sharing plan." Opening Br. at 32. The company claims there was nothing unlawful about Mr. Johnson's interruption of a representative-employee meeting and his instruction to the worker not to speak with the Union. And Coreslab insists it neither failed to bargain with the Union in good faith nor unlawfully withdrew recognition from the Union.

We conclude the Board's findings regarding Coreslab's violations of the Act are "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Under these circumstances, the Board's conclusions will be upheld unless they have "no rational basis or [are] unsupported by substantial evidence." *United Steelworkers of Am., Loc. 14534* v. *NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993) (citation omitted). As we explain, we discern no reason to

overturn the Board's judgment, and reject Coreslab's petition in this respect.

## A

Our review of the Board's decisions on the merits is deferential, and the scope of our inquiry limited. *NLRB* v. *Interstate Builders, Inc.*, 351 F.3d 1020, 1028 (10th Cir. 2003) (describing scope of review as "quite narrow"). We will not re-weigh the evidence or second guess the Board's factual inferences. *NLRB* v. *Velocity Exp., Inc.*, 434 F.3d 1198, 1201 (10th Cir. 2006). Instead, "we review only to ensure the NLRB acted within reasonable bounds and substantial evidence supports the order." *Id.*; *see* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Interstate Builders*, 351 F.3d at 1027–28.

"Although we ordinarily review questions of law *de novo*, the Board's construction of the National Labor Relations Act is entitled to considerable deference." *NLRB* v. *Okla. Fixture Co.*, 79 F.3d 1030, 1033 (10th Cir. 1996). "For the Board to prevail, it need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." *Holly Farms Corp.* v. *NLRB*, 517

12

U.S. 392, 409 (1996). It is not for this court to "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 488 (1951).

**B**

First, we review the Board's conclusions that Coreslab's selective profit-sharing payments and its failure to make pension fund contributions violated the Act. Recall, the Board found (1) the Union lacked knowledge of the company's unilateral addition of profit-sharing and failure to make pension fund contributions until 2019, and (2) these dual-track compensation systems discriminated based on Union membership status.

The Act generally bars "discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Employer conduct which "discriminates solely on the basis of union status" will fall within the Act's ambit. *Metro. Edison Co.* v. *NLRB*, 460 U.S. 693, 702 (1983). The Act proscribes the refusal to bargain collectively with union representatives. 29 U.S.C. § 158(a)(5). "[A]n employer's unilateral change in conditions of employment . . . is a circumvention of the duty to negotiate which frustrates the objectives of [§ 158(a)(5)] much as does a flat refusal." *NLRB* v. *Katz*, 369 U.S. 736, 743 (1962).

13

**1**

Coreslab contends there can be no violation of either § 158(a)(3) or (a)(5) here because the Union had known about the dual-track compensation scheme since 2005. The Union, Coreslab argues, had *actual* knowledge of the disparate pension and profit-sharing plans based on Mr. Prince's status as a Union steward. And even if not, the Union had *constructive* knowledge of the practices because it could have discovered the violations through the exercise of "reasonable diligence." Opening Br. at 26.

Coreslab's actual-knowledge argument rests on the existence of an alleged principal-agent relationship between the Union and Mr. Prince. The Board's agency determination looks to common-law agency principles. *Mar-Jam Supply Co.*, 337 NLRB 337, 337 (2001). At common law, an agency relationship may be found where an individual has *actual authority* or *apparent authority* to act on behalf of another. *Id.* In either scenario, the agency relationship must encompass the "specific conduct" at issue. *In re Cornell Forge Co.*, 339 NLRB 733, 733 (2003).

As the party asserting the existence of an agency relationship, Coreslab has the burden of establishing its existence by clear and convincing evidence. *In re Branding Iron Motel, Inc.*, 798 F.2d 396, 401 (10th Cir. 1986) ("We begin by noting that a party asserting a principal-agent relationship bears the burden of establishing its existence by 'clear

and satisfactory evidence.'" (citation omitted)). Coreslab could make this showing by demonstrating Mr. Prince's *actual* or *apparent* authority to act in lieu of the Union. *See Alfaro-Huitron* v. *Cervantes Agribusiness*, 982 F.3d 1242, 1251 (10th Cir. 2020).

Actual authority requires the *agent*'s "reasonabl[e] belie[f], in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act." *Id.* (quoting Restatement (Third) of Agency § 2.01). Apparent authority turns on a *third party*'s reasonable belief that the agent "has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* (quoting Restatement (Third) of Agency § 2.03); *see also In re Pan-Oston Co.*, 336 NLRB 305, 305–06 (2001) ("Apparent authority results from a manifestation by the principal to a third party that creates a reasonable belief that the principal has authorized the alleged agent to perform the acts in question. Either the principal must intend to cause the third person to believe the agent is authorized to act for him, or the principal should realize that its conduct is likely to create such a belief." (citation omitted)).

Whatever the agency relationship asserted, Coreslab must show Mr. Prince's agency encompassed the specific conduct—notice and consent to agreement modifications—at issue here. *Pan-Oston Co.*, 336 NLRB at 306 ("We emphasize that an employee may be an agent of the employer for one

15

purpose but not another."). Here, then, Mr. Prince's actual authority would come from the Union's express representation to Mr. Prince that he had the authority to consent to changes in the collective bargaining agreement. His apparent authority would follow from any representations made by the Union to Coreslab that Mr. Prince could consent to changes to the agreement.

Both arguments falter on the factual record before us. Mr. Evans, not Mr. Prince, was the designated point of contact for issues involving the terms of the collective-bargaining agreement. Mr. Evans and Mr. Prince confirmed Mr. Prince did not discuss the inclusion, modification, or omission of agreement terms. The Union never held out Mr. Prince as having authority to approve or decline changes to the collective-bargaining agreement. And the record indicates Mr. Drews addressed substantive matters about the collective-bargaining agreement with Mr. Evans—and Mr. Evans only. While the record suggests Mr. Prince attended at least one negotiating session, he apparently never spoke at the bargaining table. The company has provided no reason to think Mr. Prince's "mute presence" at these sessions generated actual or apparent authority, particularly given the "long-established channels of communication for bargaining matters" between Coreslab's management and Mr. Evans. AR.1622 & n.10. Substantial evidence supports the Board's reasoning, and we will not

displace the Board's finding Mr. Prince was not an "agent" of the Union "in this particular respect." AR.1622.

Still, Coreslab maintains the Union had *constructive* knowledge, even if it lacked actual knowledge. As a general matter, "the law will sometimes impute knowledge . . . to a person who fails to learn something that a reasonably diligent person would have learned." *Intel Corp. Inv. Policy Comm.* v. *Sulyma*, 140 S. Ct. 768, 776 (2020). The Board and parties relied on *Moeller Bros. Body Shop*, 306 NLRB 191 (1992), to help identify the bounds of what "reasonable diligence" means in the labor-relations context.

*Moeller Bros.* involved an employer's failure to abide by union-security provisions and pay certain benefits and contractually required wages. There, the Board rejected claims of violations which occurred before the sixth-month limitations period in 29 U.S.C. § 160(b) based on union officials' failure to exercise reasonable diligence.

> Had the Union made even a minimal effort to monitor the Respondent's facility since 1983, it should have become aware of the Respondent's policy of hiring prejourneymen at individually negotiated pay rates, without making fringe benefit payments on their behalf. Mere observation would have put the Union on notice that the number of unit employees was at least double the number reported on the Respondent's fringe benefit forms. The Union rarely visited the Respondent's operation however, never appointed a shop steward, . . . and never took any measures to enforce the union-security provisions of the contract.

17

306 NLRB at 192. "[A] union is not required to aggressively police its contracts," the Board explained, but "it cannot with impu[]nity ignore an employer or a unit . . . and then rely on its ignorance of events . . . to argue that it was not on notice of an employer's" unfair labor practices. *Id.* at 193.

We agree with this general proposition from *Moeller Bros.* But we also agree with the Board majority's holding "the facts of that case are clearly distinguishable" from those before us. AR.1623. To be sure, we share some of Member Ring's alarm that Coreslab's basic compensation practices apparently escaped Mr. Evans's attention for well over a decade. But "[o]ur job isn't to make the call ourselves, . . . only to ask whether a reasonable mind could have made the call the NLRB made." *Laborers' Int'l Union of N. Am., Loc. 578* v. *NLRB*, 594 F.3d 732, 734 (10th Cir. 2010).

Like the Board majority, we cannot ascribe Mr. Evans's dilatory awareness of these changes to the lack of "reasonable diligence" described in *Moeller Bros.* 306 NLRB at 192. Unlike the officials in *Moeller Bros.*, Mr. Evans frequented the Coreslab facility and interacted with employees there. Unlike the unfair labor practices at issues in *Moeller Bros.*, the profit-sharing and pension fund violations were not literally visible. And where the employer in *Moeller Bros.* provided regular reports that did not match the facts—e.g., by misstating the number of employees working at any given time—Coreslab has identified nothing the company or the Fund provided to

18

the Union that could have placed Mr. Evans on notice of the violative

compensation practices.

The Board's conclusion that the Union lacked knowledge of the

pension contribution/profit-sharing scheme until Coreslab informed Mr.

Evans on September 6, 2019 is supported by substantial evidence.[4]

---

[4] On appeal, Coreslab argues the Board erred in finding the company's § 10(b) limitations argument waived. We need not reach this argument. Even if Coreslab properly raised this defense before the agency and the Board was wrong to conclude otherwise, the defense would be unavailing based on the panel's resolution of the notice/knowledge issues.

As discussed, Mr. Prince had no agency to bind the Union to a modification of the collective bargaining agreement. Whether notice to Mr. Prince could have constituted notice to the Union may be a closer question, however. Ordinarily, the Union steward is the agent through which a Union learns of breaches. But on the record before us—which involves breach of contractual provisions governing compensation practices, not the sort of day-to-day work of employees—we conclude the Board could reasonably find Mr. Prince was not an agent for notice of this breach.

We thus agree with the Board the Union lacked knowledge of the violations until September 2019, so the six-month clock in § 10(b) would not begin to run until that time. *See, e.g.*, *Esmark, Inc.* v. *NLRB*, 887 F.2d 739, 746 (7th Cir. 1989) ("The 10(b) period begins when the victim of an unfair labor practice receives *unequivocal notice* of a final adverse decision. Rumors or suspicions will not do; nor is it relevant when an unlawful decision was actually made, if the decision was not communicated to the affected party until later. . . . The 10(b) period does not commence until an aggrieved party has knowledge of the facts necessary to support a present, ripe, unfair labor practice charge.").

19

**2**

Coreslab next contends the Board erred in concluding its withholding of pension contributions and its provision of profit-sharing payments to non-Union employees violated the Act. We disagree.

Recall, an employer violates 29 U.S.C. § 158(a)(3) if it "discriminat[es] in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization." Here, Coreslab provided profit-sharing payments to non-Union members. It did not provide profit-sharing payments to Union members. Regardless of *why* it initiated this dual-track compensation scheme, Coreslab has not otherwise argued the provision and denial of this benefit turned on any other basis beyond Union membership. Accordingly, substantial evidence supports the Board's conclusions Coreslab withheld benefits "solely on the basis of union status," *Metro. Edison Co.*, 460 U.S. at 702, and that this facially discriminatory distinction "bears its own indicia of intent to discourage or encourage membership in the Union," AR.1625 (internal quotation marks omitted). *See also NLRB* v. *Great Dane Trailers, Inc.*, 388 U.S. 26, 32 (1967) (explaining an employer discriminates under § 158(a)(3) by "paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity").

20

An employer violates 29 U.S.C. § 158(a)(5) when it shirks its statutory obligation to bargain before changing the terms and conditions of employment settled upon in a collective-bargaining agreement. *Katz*, 369 U.S. at 743 (explaining a "unilateral change in conditions of employment . . . is a circumvention of the duty to negotiate which frustrates" the Act). Here, the record confirms Coreslab did not bargain with the Union before it ceased making pension contributions for all hours worked by bargaining unit employees. This was a "unilateral change" encompassed by 29 U.S.C. § 158(a)(5).

Accordingly, we conclude substantial evidence supports the Board's findings of Act violations based on the refusal to make full pension contributions and the commencement of a profit-sharing plan that did not include Union members.

**C**

Coreslab also argues it did not violate the Act by telling a worker he could not speak with Union officials. We discern no error in the Board's finding to the contrary.

The Act prohibits an employer's interference with, restraint, or coercion of employees in the exercise of guaranteed rights. 29 U.S.C. § 158(a)(1). To be liable under § 158(a)(1), an employer need not actually succeed in infringing an employee's rights. Rather, "[t]he test is . . . whether

the employer engaged in conduct which *reasonably tends* to interfere with, restrain or coerce employees in the free exercise of their rights." *Lear Siegler Inc.* v. *NLRB*, 890 F.2d 1573, 1580 (10th Cir. 1989) (quoting *Medallion Kitchens, Inc.* v. *NLRB*, 806 F.2d 185, 191 (8th Cir. 1986)) (emphasis added) (internal quotation marks omitted).

According to Coreslab, Mr. Johnson's statement in the breakroom could not reasonably tend to interfere, restrain, or coerce protected rights because (1) "[t]here is no evidence that [Mr.] Johnson's statements had any effect on" the individuals involved and (2) Mr. Evans was speaking to a temporary worker employed by a staffing service. Opening Br. at 44–45. We are not persuaded.

As the Board correctly explains, whether the statement affected the employee is irrelevant—an employee's "subjective response does not bear on the issue" because liability may lie "regardless of whether the 'coercion has succeeded or failed.'" NLRB Br. at 16 (quoting *Lear Siegler*, 890 F.2d at 1580). As for the employee's temporary status as an employee of a staffing company, the Supreme Court has endorsed Board precedent holding an "'employer' may violate [§ 158(a)(1)] with respect to employees other than his own." *Hudgens* v. *NLRB*, 424 U.S. 507, 510 n.3 (1976). On this record, we have no great difficulty concluding Mr. Johnson's directive that the employee could not speak with Union President Evans would "reasonably

22

tend" to interfere with the employee's right to speak to union representatives.

**D**

Next, Coreslab insists "[t]he Board erroneously found the Company failed to bargain with the Union in good faith for a successor agreement." Opening Br. at 45.

Recall, an employer will violate 29 U.S.C. § 158(a)(5) by failing to "bargain collectively with the representatives of [its] employees" "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). "Parties must bargain in good faith to comply with the statutory duty, but bad faith is not a necessary element for a breach of the duty." *Norris* v. *NLRB*, 417 F.3d 1161, 1168 (10th Cir. 2005) (citing *Katz*, 369 U.S. at 742–43). "The employer's duty to bargain collectively 'includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative.'" *Id.* (quoting *Detroit Edison Co.* v. *NLRB*, 440 U.S. 301, 303 (1979)).

Here, the record supports the Board's conclusion Coreslab failed to bargain in good faith. Coreslab refused to meet with the Union more than three times over a five-month period, despite repeated requests from the Union. After a first meeting on April 10, 2019, Coreslab cancelled the

23

scheduled negotiation on April 19—and refused to reschedule for three months. On appeal, Coreslab points to the pending audit of the Central Pension Fund to explain its delay. But, like the Board, we are left to wonder "why that should halt all bargaining." AR.1627. At the same time the company proposed modifying pension contributions and adding profit-sharing, it declined to inform the Union it had already made those changes unilaterally until the third, final bargaining session. And, even after informing Mr. Evans of the profit-sharing plan and receiving his request for further information about it, Coreslab refused to provide the relevant information requested by the Union about this plan.

We conclude the Board's finding of the § 158(a)(5) bargaining violation is amply supported by substantial evidence.

**E**

Finally, Coreslab argues there was nothing unlawful about its withdrawal of recognition from the Union. Rather, the disaffection petition signed by 18 of the 26 bargaining unit employees provided "objective evidence the Union no longer had the support of a substantial majority of the unit." Opening Br. at 50. Under these circumstances, Coreslab maintains, the Act permits an employer to withdraw recognition.

Coreslab is correct that a "petition expressing disaffection that is signed by a majority of the represented unit . . . provides reliable evidence

24

of actual loss of support." *Id.* at 50; *see Leggett & Platt, Inc.* v. *NLRB*, 988 F.3d 487, 493 (D.C. Cir. 2021). But, as the Board convincingly argues, that general principle is of limited force here because Coreslab cannot defend its withdrawal based on a disaffection petition tainted by "its own unfair labor practices." NLRB Br. at 42.

"[U]nfair labor practices which are of a character as to cause employee disaffection with the union, or at least have a meaningful impact in bringing about that disaffection, will taint a subsequent employee antiunion petition" and may not serve as the basis for withdrawing recognition from the Union. *Manna Pro Partners, L.P.* v. *NLRB*, 986 F.2d 1346, 1353 (10th Cir. 1993). To decide whether the unfair labor practices "are of a character as to . . . cause employee disaffection," the Board weighs the four factors identified in *Master Slack Corp.*, 271 NLRB 78, 84 (1984). Those facts are (1) the temporal proximity between the unfair labor practices and the withdrawal of recognition, (2) the nature of the unfair labor practices, (3) the tendency of the unfair labor practices to cause employee disaffection from the union, and (4) the effect of the unfair labor practices on unit employee morale, organizing, and union membership. *Id.*

The Board carefully considered each factor, and we conclude substantial evidence supports its findings. At (1), the disparate compensation system was ongoing at the time of the disaffection petition.

At (2), the Board rightly found unilateral additions and alterations to compensation programs, made in disregard of the terms of the collective-bargaining agreement itself, will undermine employees' perception of the Union's effectiveness. Under prong (3), we agree with the Board that the tendency of the unfair labor practice to cause disaffection was amply demonstrated by Mr. Drews's discussion with bargaining unit employees, who were upset to hear they might lose their profit-sharing payments and never benefit from the pension contributions required by the collective-bargaining agreement. And as to (4), that *Master Slack* factor is borne out by the facts on the ground—employees told Mr. Drews they did not join the Union because of the unlawful profit-sharing plan.

The Board correctly applied *Master Slack* to explain why the disaffection petition could not render lawful the company's withdrawal of recognition. Coreslab has provided no alternative to support the withdrawal, and we see no basis to disturb the Board's conclusion Coreslab violated the Act by this action.

## III

Having affirmed the Board's findings on Coreslab's violations of the Act, we turn to the company's petition for review of the remedies selected by the Board for those violations. We can discern no abuse of discretion on most of these remedies. But we find the Board exceeded its statutory

26

authority under the Act by ordering back-payments *without offset* and requiring Coreslab to retain the unlawfully-created profit-sharing program.[5]

## A

As a threshold matter, the Board argues we lack jurisdiction to consider Coreslab's objections to the make-whole remedies because the company did not challenge them before the Board. Coreslab points to places in the record where it *did* contest the award of back-payment without offset,

---

[5] Coreslab contends the Board also abused its discretion by ordering the company "to recognize and bargain with the Union," Opening Br. at 55, though this argument seems to disappear by the Reply Brief. In any case, it lacks merit. In considering the propriety of an affirmative bargaining order, the Board already took the extra steps required by the D.C. Circuit—but not our own. *See NLRB* v. *Cmty. Health Servs., Inc.*, 483 F.3d 683, 688 (10th Cir. 2007) ("We are aware that the District of Columbia Circuit requires the Board to adopt additional findings to support a remedial bargaining order. Even were we to endorse that circuit's rule, we would find it satisfied here." (citation omitted)). And it correctly addressed the impact of the tainted disaffection petition. *See Johnson Controls, Inc.*, 368 NLRB No. 20, 2019 WL 2893706, at *9 (July 3, 2019) (explaining a "union that receives . . . notice of anticipatory withdrawal . . . . may file an unfair labor practice charge alleging . . . that the petition is tainted by serious unremedied labor practices").

In a single paragraph, Coreslab challenges "[t]he remainder of the Board's remedies" as unenforceable because "the Board's findings of various violations are unsupported by substantial evidence and/or arbitrary." Opening Br. at 65. As we have explained, we find no error in the Board's conclusion Coreslab violated the Act, and decline to disturb the Board's remedies on that basis.

but the Board rejoins the company's failure to move for reconsideration means the issue has not been preserved.

We therefore understand the Board to identify two impediments to our jurisdiction. To address them and assure "ourselves that our jurisdiction is proper," *Cotton Petroleum Corp.* v. *U.S. Dep't of Interior*, 870 F.2d 1515, 1521 (10th Cir. 1989), we must first consider whether Coreslab challenged—and challenged adequately—the make-whole remedies before the Board. If so, we must still determine whether Coreslab's failure to move for reconsideration of the Board's order divests this court of jurisdiction to entertain those challenges on a petition for review. After explaining the jurisdictional color of 29 U.S.C. § 160(e)'s preservation requirement, we address both the Board's contentions and conclude we have jurisdiction.

**1**

Preservation concerns[6] typically bear on whether it is appropriate for a party to raise an argument on appeal, not on whether we have the power

---

[6] Confusingly, courts describe § 160(e) in terms of "exhaustion," "preservation," and "jurisdiction." *Compare Noel Canning* v. *NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013) (comparing § 160(e) to other "jurisdictional exhaustion" provisions), *with Allied Aviation Serv. Co. of N.J.* v. *NLRB*, 854 F.3d 55, 62 (D.C. Cir. 2017) (referring to § 160(e)'s "preservation requirement").

28

to consider it. *See First W. Cap. Mgmt. Co.* v. *Malamed*, 874 F.3d 1136, 1144 (10th Cir. 2017) (explaining that "'[n]ormally when a party presents a new argument on appeal and fails to request plain error review, we do not address it[,]' [b]ut even when a party fails to preserve an issue, we retain 'discretion to raise and decide issues sua sponte' . . . because '[w]aiver . . . binds only the party, not the court'" (citations omitted)). But the terms of the Act itself transform preservation issues into jurisdictional questions. That is because, under 29 U.S.C. § 160(e), "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." In turn, § 160(e)'s "objection" requirement is satisfied when "the matter the petitioner seeks to raise here [was] pressed before the Board with 'sufficient specificity and clarity' so the tribunal was aware it needed to be addressed and could become the subject of litigation in this court." *Pub. Serv. Co. of N.M.* v. *NLRB*, 692 F.3d 1068, 1073 (10th Cir. 2012) (quoting *Interstate Builders*, 351 F.3d at 1034 n.8). "[W]hatever else § 160(e) may be designed to do, it's

---

In *Public Service Company of New Mexico* v. *NLRB*, we explained § 160(e) embodies an "'objection' requirement," but confirmed § 160(e) operates as a "true jurisdictional limit." 692 F.3d 1068, 1073, 1076 (10th Cir. 2012). "[T]he language of § 160(e) speaks to the power of the reviewing *court*, a fact that distinguishes it from many non-jurisdictional requirements addressed only to the *parties*." *Id.* at 1076.

29

plain from its face that it seeks to allow the agency at least the chance to apply its expertise to a problem before it comes to us." *Id.* Indeed, the "salutary policy" behind § 160(e) "afford[s] the Board opportunity to consider on the merits questions to be urged upon review of its orders[s]." *Marshall Field & Co.* v. *NLRB*, 318 U.S. 253, 256 (1943). Adherence "assure[s] that the Board is fully alerted to the contentions of the parties and aware that they should be addressed and ruled upon." *NLRB* v. *L & B Cooling, Inc.*, 757 F.2d 236, 240 (10th Cir. 1985). "In each case," the D.C. Circuit has explained, "the critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal." *Consol. Freightways* v. *NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981).

From this we summarize the general principle: If a party does not "urge[]" an objection before the Board—meaning raise it in a manner sufficient to place the Board on notice it should be addressed and may become an issue in this court—we may not consider the objection for the first time on appeal absent extraordinary circumstances. 29 U.S.C. § 160(e).

**2**

With this foundation in mind, we turn to the Board's first jurisdictional argument that Coreslab inadequately objected to the make-

30

whole remedies before the agency. In considering this contention, we assess both the exceptions filed by Coreslab and how the Board understood them.

In its exceptions to the ALJ's order, Coreslab objected to the "retroactive grant of [a] profit[-]sharing benefit remedy," to the "grant of [a] profit[-]sharing benefit remedy," and to mandated "contributions to the Central Pension Fund" as "contrary to the law and substantial weight of the record." AR.1494–95. As we evaluate the sufficiency of these objections, our opinion in *Public Service Company* is instructive. There, petitioners made a two-sentence objection to the ALJ's analysis. 692 F.3d at 1073–74. We found this objection sufficient—though barely—to preserve the issue for review in this court. *Id.* at 1074. We also found citations to the ALJ's order included in the exceptions "put a little more meat on the bone, directing the Board to the specific reasoning the ALJ offered on these particular issues." *Id.*[7]

Here, Coreslab's exceptions to the make-whole remedies were similarly terse. But *Public Service Company* directs us to find them sufficient to satisfy § 160(e)'s preservation requirement. As in that case, we cannot say the brevity of Coreslab's objections rendered them inadequate to

---

[7] We are unpersuaded, then, by the Board's contention that Coreslab's objections were as bare-bones as the objections found insufficient in *NLRB* v. *Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 350 (1953).

place the issue before the Board on intra-agency review. And we observe, like the petitioners in *Public Service Company*, Coreslab included citations to the record where the ALJ reasoned through the challenged action. Coreslab's objections to the ALJ's remedies "w[ere] (just) enough to preserve" the issue for our review. *Pub. Serv. Co.*, 692 F.3d at 1074.

Our law also directs us to look beyond the exceptions themselves. To determine whether an issue has been urged before the Board, we must consider whether the Board itself understood an obligation to address an argument and was provided the opportunity to do so. *See L & B Cooling*, 757 F.2d at 240.

Here, we cannot say the exceptions were insufficient to put the Board on notice the make-whole remedies might come up on appeal. To the contrary, as in *Public Service Company*, though "the Board might have been within its rights to consider [the exceptions] insufficient for any purpose," the Board "[i]nstead . . . chose to address the . . . objections it felt it could discern lurking here." 692 F.3d at 1074. Clearly, then, Coreslab's submission "provid[ed] sufficient specificity and clarity"—albeit with "painful brevity"—"to allow the Board to bring its expertise to bear." *Id.*; *see also Interstate Builders*, 351 F.3d at 1034 n.8 (considering whether the Board was "aware" of the need to decide an issue).

Recall, the "salutary policy" behind § 160(e)'s preservation requirement guarantees the Board a first chance "to consider on the merits questions to be urged upon review of its order[s]." *Marshall Field & Co.*, 318 U.S. at 256. Here, the Board expressly concluded any challenge to the make-whole remedies without offset would be unmeritorious based on Board precedent "finding a wrongdoing employer 'cannot complain of the extra cost of improperly created, substitute fringe benefits.'" AR.1630 n.32. For that proposition, it cited its holding in *In re Harding Glass Company*, 337 NLRB 1116, 1118 (2002), in which the Board rejected a similar argument that "contribution payments due . . . must be offset by the value of any alternative payments [already] made."

On this record, we cannot conclude our exercise of jurisdiction would deprive the Board of an opportunity to consider the issue in the first instance. Coreslab challenged the remedies—if generally and briefly—and the Board opted to defend the make-whole orders with a specificity that encompassed the issue currently before us. "Whether or not each of these things alone might be sufficient, in light of them collectively," we find Coreslab "present[ed] qualifying 'objections' on these two issues under

§ 160(e)" and allowed "the Board to bring its expertise to bear." *Pub. Serv. Co.*, 692 F.3d at 1074.[8]

---

[8] Coreslab argues an alternative basis for our jurisdiction. Because the make-whole order without offset veered from remedial to punitive, the company contends, the Board exceeded the policy parameters of the Act. And this court, Coreslab urges, "may review actions that exceed the Board's statutory authority irrespective of [§ 160(e)]." Reply Br. at 19.

As Coreslab correctly points out, § 160(e) bears its exceptions. We may exercise our jurisdiction over a challenge despite a party's failure to object before the agency in the case of "extraordinary circumstances," 29 U.S.C. § 160(e), or where the decision at issue clearly demonstrates the Board exceeded its statutory authority, *NLRB* v. *Cheney Cal. Lumber Co.*, 327 U.S. 385, 388 (1946) ("[I]f the Board has patently traveled outside the orbit of its authority," then "there is legally speaking no order to enforce.").

"Congress has imposed on [us] responsibility for assuring that the Board keeps within reasonable grounds." *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 490 (1951). To police those bounds of agency action, federal courts must retain the ability to consider "[c]ertain jurisdictional challenges" which "need not be raised before the Board to be considered on review." *Carroll Coll., Inc.* v. *NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009) (finding Board lacked jurisdiction over petitioner despite petitioner's failure to raise jurisdictional argument before the Board). At bottom, "[a] court can always invalidate Board action" when that action "is patently beyond the Board's jurisdiction, even if the jurisdictional challenge was never presented to the Board." *Loc. 900, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO* v. *NLRB*, 727 F.2d 1184, 1191 n.5 (D.C. Cir. 1984).

Because we find Coreslab adequately urged its exceptions before the Board, we need not determine whether we would also have jurisdiction because the Board's make-whole remedies without offset exceeded the bounds of its statutory authority.

34

**3**

Even accepting Coreslab's objection was urged before the agency, the Board insists we still lack jurisdiction because "Coreslab needed to file a motion for reconsideration with the Board to preserve that challenge for appeal." NLRB Br. at 51–52 (citing *Woelke & Romero Framing, Inc.* v. *NLRB*, 456 U.S. 645, 665–66 (1982)). We are unpersuaded.

We observe, as a preliminary matter, the statutory provisions governing our jurisdiction do not require reconsideration motions to preserve challenges. *See* 29 U.S.C. § 160(e) (obliging parties only to "urge[]" objections before the Board). And as Coreslab persuasively argues, the agency's own regulations provide no such requirement: A party "may . . . move for reconsideration," but "[a] motion for reconsideration . . . *need not be filed to exhaust administrative remedies*." 29 C.F.R. § 102.48(c), (c)(3) (emphasis added).

Instead, the Board's argument for the necessity of a reconsideration motion rests solely on *Woelke & Romero*. In that case, the Supreme Court held the petitioners "could have objected to the Board's decision in a petition for reconsideration or hearing," and the "failure to do so prevent[ed] consideration of the question by the courts." 456 U.S. at 666. For support, the Court cited *International Ladies' Garment Workers' Union, Upper South Department, AFL-CIO* v. *Quality Manufacturing Co.*, 420 U.S. 276, 281 n.3

35

(1975), in which it had previously held an objection "may not be considered" when the objecting party fails to avail itself of the post-judgment motions provided for by Board regulations.

We rejected a similar argument from the Board in *Facet Enterprises, Inc.* v. *NLRB*, 907 F.2d 963, 971–72 (10th Cir. 1990). There, the ALJ found Facet Enterprises violated its statutory duty to bargain in good faith by unit-splitting—or separating employees in one facility from an "established appropriate bargaining unit." *Id.* at 970. The Board agreed the employer violated its statutory duty. But its amended conclusions of law based that determination on a different ground, "finding instead that Facet was culpable for direct dealing." *Id*. Facet Enterprises contended—before this court—that the "switching of legal theories by the Board on appeal violated due process." *Id.* The problem, though, was that Facet Enterprises failed to object to the Board's recasting of the violation by moving for reconsideration. The agency pointed out as much, and contended *Woelke & Romero* and *Garment Workers' Union* "preclude[d] our review of [the company's] due process claim." *Id.* at 971.

We disagreed, distinguishing *Woelke & Romero* and *Garment Workers' Union* by explaining those cases were concerned with circumstances when the Board lacked entirely "an opportunity to consider" claims the petitioning employers advanced on appeal. We find that distinction

36

persuasive on these analogous facts. As in *Facet Enterprises*, the Board *did* address the company's challenge to the action contested by the employer—and defended by the Board—on review before this court. When switching legal bases for liability, the Board in *Facet Enterprises* had already "considered specifically the due process implications." *Id.* at 971. So too here, where the Board addressed and defended a potential objection to the make-whole remedies without offset.

In *Facet Enterprises*, we reasoned "[t]he policies underlying [§ 160(e)], *i.e.*, notice, efficiency and providing the Board with the first opportunity to consider a claim, would have been undermined had the Supreme Court allowed judicial review" in *Woelke & Romero* and *Garment Workers' Union*. 907 F.2d at 971. In contrast, those policy considerations were not implicated when the Board already had that first opportunity, and Coreslab's "filing a motion seeking reconsideration of the Board's decision would have been" the "empty formality" we have refused to require of parties invoking our jurisdiction. *Id.* at 972. On these facts, we decline to convert a motion for reconsideration into a jurisdictional requirement.

**B**

Having assured ourselves of jurisdiction, we next address our standard of review and then the propriety of the Board's remedies.

37

The Board enjoys broad discretion to craft remedies appropriate for violations of the Act. *Fibreboard Paper Prods. Corp.* v. *NLRB*, 379 U.S. 203, 216 (1964); *accord NLRB* v. *Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969) ("In fashioning its remedies under the broad provisions of [29 U.S.C. § 160(c)] . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.").

But that deference cannot extend to remedial orders "other than those which can fairly be said to effectuate the policies of the Act," *Va. Elec. & Power Co.* v. *NLRB*, 319 U.S. 533, 540 (1943), or those exceeding a "rational and consistent" interpretation of the Board's statutory authority, *NLRB* v. *United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 123 (1987). The power Congress granted to the Board to rectify unfair labor practices is—and must be in its exercise—"remedial, not punitive." *Republic Steel Corp.* v. *NLRB*, 311 U.S. 7, 12 (1940).

## C

We conclude two of the Board's ordered remedies are inconsistent with the purposes and policies of the Act.

First, the orders to provide back payments under the profit-sharing plan and back payments to the Central Pension Fund *without offset* exceeded the Board's authority. As Coreslab persuasively explains, the

Board's otherwise broad discretion to craft a response to an employer's unfair labor practices stops when that response veers from remedial to punitive. *See Republic Steel*, 311 U.S. at 9 (providing for deductions from award amounts "because, having already been received, these amounts were not needed to make the employees whole"). To comply with the Act, the Board should have ensured its remedies were "sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practice." *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 900 (1984). Here the Board orders to provide full back-pension contributions *and* provide full back-profit-sharing payments to all employees *without offset* for the compensation already provided to them were *not* "sufficiently tailored" to the actual harms suffered by those employees, and must be made so on remand.

Second, the order to retain the profit-sharing program *unless the Union requested its recission* similarly exceeded the Board's authority. As we have previously explained, "the Board's remedial powers are 'limited to carrying out the policies of the [Act] . . .,' and '[o]ne of these fundamental policies is freedom of contract.'" *Teamsters Loc. Union No. 435* v. *NLRB*, 92 F.3d 1063, 1072 (10th Cir. 1996) (quoting *H.K. Porter Co., Inc.* v. *NLRB*, 397 U.S. 99, 108 (1970)). "[T]he Board cannot dictate the terms of a labor contract, which should be decided upon by the give and take of collective

bargaining." *Id.* at 1072–73. It may be that Coreslab and the Union decide to continue the profit-sharing program alongside, or in lieu of, the pension program. But that is a decision for the parties to make during the bargaining process the Act protects.

## IV

For these reasons, we **GRANT IN PART** and **DENY IN PART** Coreslab's petition for review. We **DENY** the part of Coreslab's petition challenging the Board's conclusions Coreslab violated several provisions of the National Labor Relations Act and its remedial orders to provide the Union with relevant information and to recognize the Union and bargain with it in good faith. But we **GRANT** Coreslab's petition to the extent it contends the Board exceeded its statutory authority by ordering remedial back payments without offset for prior compensation and by ordering the company to maintain the profit-sharing plan. We **GRANT** Coreslab's unopposed motion to lodge non-record materials.

Accordingly, we also **DENY** the Board's cross-petition for enforcement.

We **REMAND** to the Board for further proceedings consistent with this opinion.

23-9502/9505, *Coreslab Structures v. NLRB*
**HARTZ**, J., partially dissenting.

I agree with the analysis of the panel opinion except on one point. On the issue of constructive knowledge, I do not think a reasonable person could say that it was reasonable for union leadership to fail for eight years to check on whether the employer was complying with a contract provision as important as the provision of a pension. I would hope, and expect, that any union that tried to defend such gross neglect would find itself in a battle with a competing union offering better representation.